UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN ADMIRALTY

CASE NO. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

THE CONTINENTAL INSURANCE
COMPANY,

        Plaintiff,

vs.

BARRY BLUMENTHAL, D.O.,

        Defendant.

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, THE CONTINENTAL INSURANCE COMPANY, by and through its undersigned counsel, and hereby files this Motion for Summary Judgment in accordance with the Federal Rules of Civil Procedure and Fed.R.Civ.P. 56 and states as follows:

## GENERAL STATEMENT OF FACTS

Barry Blumenthal, D.O., is the owner of a 42' 1994 Mainship flybridge sedan known as the "BLUE ACE III". Dr. Blumenthal and his wife bought the vessel new in 1994. The BLUE ACE III was insured by The Continental Insurance Company (Continental), yacht policy no. AYL5020334, for the periods Oct. 18, 2001 - Oct. 18, 2002, and Oct 18, 2002 - Oct. 18, 2003. (Exhibit 1) In June 2002, Dr. Blumenthal moved the boat to the Palm Bay Club in Miami-Dade County, Florida. Dr. Blumenthal did not live at the Palm Bay Club, but his acquaintance, Dr. Alton Ingram, lived there and was entitled to the rental of a boat slip.

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

On Sunday, July 14, 2002, Dr. Ingram and his friends were using the boat of Dr. Blumenthal when they ran aground on a sandbar in Biscayne Bay on the south side of the Rickenbacker Causeway. Dr. Ingram called Dr. Blumenthal, notified him that the boat had run aground, and asked Dr. Blumenthal if he had a towing service. (Exhibit 2, Sworn Statement of Barry Blumenthal, M.D., p. 9) Dr. Blumenthal advised him to call Sea Tow. A few hours later, Dr. Ingram told Dr. Blumenthal that he was still with the boat waiting for Sea Tow to arrive. Dr. Ingram stated he would make sure the boat got back to safe dockage and he would take care of any repair bills associated with the grounding. (Exhibit 2, p. 11) Dr. Blumenthal did not speak to Dr. Ingram again that day.

A few weeks later, Dr. Ingram advised Dr. Blumenthal everything had been taken care of. (Exhibit 2, p. 12) However, when Dr. Blumenthal went to the Palm Bay Club, he realized his boat wasn't there. He stated he tried to contact both Dr. Ingram and Sea Tow and was unable to get a response from either as to the location of his vessel.

On January 7, 2003, approximately six months after the boat incident, Dr. Blumenthal's attorney, Walter Pesetsky, finally reported the missing boat to Mike Costello of C&L Insurance Inc. and made a claim for damages. (Exhibit 3) He notified Underwriters at Continental of the loss on February 11, 2003. (Exhibit 4)

Several months later, on July 3, 2003, Dr. Blumenthal informed Continental that the BLUE ACE III had been located, and was stored out of the water at Agra Yacht Service on the Miami River. (Exhibit 5). An inspection of the vessel showed it had been out of water for almost

LAW OFFICES OF UNDERWOOD, KARCHER & KARCHER, P.A.
THE ATRIUM - SUITE 235, 1500 SAN REMO AVENUE, CORAL GABLES, FLORIDA 33146 • TEL. (305)661-2888

2

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

a year, and more that $40,000.00 in damage had occurred to the vessel. (Exhibit 6)  Dr. Blumenthal  has made a claim for the damage to the vessel resulting from being stored out of water for more than a year.  Agra Yacht Service has a claim against the vessel for storage fees. (Exhibits 7)

Continental has filed its declaratory judgment action asking the court to determine its rights and duties under the insurance policy issued for the BLUE ACE III.  Continental is now filing this Motion for Summary Judgment and states there are no genuine issues of material fact as to Defendant's material breach of the terms and conditions of the policy of insurance and as to the exclusions in the policy related to the deteriorated condition of the vessel.  Therefore, Continental is entitled to summary judgment on all issues as a matter of law.  Plaintiff is asking this Court to grant summary judgment in its favor, and to rule that there is no coverage under the policy for damage to the vessel or storage charges.

## I.  STATEMENT OF UNDISPUTED FACTS

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Rules of Civil Procedure and the Supplemental Rules For Certain Admiralty and Maritime Claims.

2.      This court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §2201, to determine whether there is coverage under a claim for marine insurance.

3.      The Plaintiff, The Continental Insurance Company, is a marine insurance company which transacts business in the State of Florida and issued America Yacht policy no.

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

AYL5020334 for a 1994 40' Mainship sedan known as BLUE ACE III to Dr. Barry Blumenthal. (Exhibit 1)

4. Defendant, Barry Blumenthal, D.O. (Dr. Blumenthal), resides in Miami-Dade County, Florida,  and is the owner of BLUE ACE III. (Exhibit 1)

5. In June 2002, Dr. Blumenthal moved the BLUE ACE III to the Palm Bay Club, Miami-Dade County, Florida,  where it was docked at that complex. (Exhibit 2, p. 7)

6. Dr. Alton Ingram, an acquaintance of Dr. Blumenthal, lived at the Palm Bay Club and had access to a boat slip. (Exhibit 2, p. 7)

7. Although the boat was kept at Dr. Ingram's dock space, Dr. Blumenthal states he did not give Dr. Ingram permission to use the vessel. (Exhibit 2, p. 8)

8. On Sunday, July 14, 2002, Dr. Ingram and some of his friends used the boat and subsequently grounded the vessel on a sandbar just south of the Rickenbacker Causeway on Key Biscayne.  (Exhibit 2, p. 10)

9. Dr. Ingram notified Dr. Blumenthal of the grounding and inquired as to towing service. (Exhibit 2, p. 9)

10. A few weeks later, Dr. Blumenthal went to the Palm Bay Yacht Club and realized that both his boat and Dr. Ingram were missing.  (Exhibit 2, p. 12)

11. Dr. Blumenthal was unable to contact either Dr. Ingram or Sea Tow to determine the location of his boat.

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

12.     Finally, on January 7, 2003, almost six months after the grounding, Dr. Blumenthal's

attorney, Walter Pesetsky, made a claim for the loss to Mike Costello of C&L Insurance,

Inc. stating:

> That under the yacht policy AYL5020334, Dr. Blumenthal's yacht
> is missing and presumed lost.  We have been endeavoring to find
> said yacht, but have been unsuccessful.
>
> In accordance with the above-captioned policy we are hereby
> making claim for the loss of Dr. Blumenthal's yacht.

(Exhibit 3)

13.     On February 11, 2003, American Yachts Limited, the claims handling agents for

Continental, received a letter from Attorney Pesetsky which provided the following

information:

> 1.     Date of loss -- Sunday, July 14, 2002 between 5:30
>        p.m. and 6:00 p.m.
>
> 2.     Loss location -- South side of Rickenbacker
>        Causeway, ran aground on sandbar and called Sea
>        Tow.
>
> 3.     Police Report -- None.
>
> 4.     Boat last seen and by whom -- July 14, 2002, Dr.
>        Alton Ingram and Lisa Glode.

(Exhibit 4)

14.     Months later, on July 3, 2003, Attorney Petsetsky reported the boat had been located and

is presently stored at Agra Yacht Services, Inc., a boat yard along the Miami River in

Miami-Dade County, Florida. (Exhibit 5)

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

15. The boat is in a deteriorated condition and the estimated cost of repair is in excess of $40,000.00.  (Exhibit 6)

16. Moreover, the boat has been stored at Agra Yacht Services since August 2002, and the boatyard is seeking payment for storage charges in excess of $18,000.00. (Exhibit 7)

17. The policy of insurance no. AYL5020334 issued by Continental states:

### Section II

### Your Duties After a Loss

A. Notice of Loss

1. ***You must give notice of any loss as soon as practicable*** to either your agent or us.  If the loss is by theft or vandalism, you must notify the police authority having jurisdiction. (emphasis added)

2. We must be told:  (a) the name of the insured; (b) your policy number; (c) all details of the loss including where and how the event occurred; and (d) the name and address of any witnesses.

(Exhibit 1)

18. Dr. Blumenthal has materially breached the terms and conditions of his policy of insurance by failing to report the loss as soon as it was discovered.

19. Moreover, much of the claimed loss to the vessel itself was caused by deterioration as the result of the boat being stored out of the water at Agra Yacht Services.  There is no coverage for this loss in the policy.  (Exhibit 1)

20. The policy states in Section IV - Hull Coverage:

LAW OFFICES OF UNDERWOOD, KARCHER & KARCHER, P.A.
THE ATRIUM - SUITE 235, 1500 SAN REMO AVENUE, CORAL GABLES, FLORIDA 33146 • TEL. (305)661-2888

6

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

## C. EXCLUSIONS

**We do not provide hull coverage for:**

2.      Gradual deterioration (including deterioration caused by weathering, insect, mold, animal, vermin or marine life):

3.      Marring, chipping, scratching, fading or denting;

4.      Inherent vice (including wet or dry rot, rust or corrosion);

5.      Osmosis, blistering, delamination or electrolysis;

7.      Lack of reasonable care or due diligence in the maintenance of the covered property.

WHEREFORE, as there are material breaches to the terms and conditions of the policy of insurance and specific exclusions to the damages claimed by Defendant, Dr. Blumenthal, and as there are no genuine issues of material fact to place before a trier of fact, Plaintiff, The Continental Insurance Company, is entitled to summary judgment on all issues presented in Plaintiff's Complaint and hereby moves this Court to grant summary judgment and enter an order declaring there is no coverage for Defendant's losses under the policy of insurance no. AYL5020334.

## II.  MEMORANDUM OF LAW

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); see also

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

<u>Celotex Corp.v. Catrett</u>, 477 U.S. 317, 323 (1986).  When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  Issues of material fact are "genuine" only if they require resolution by a trier of fact. <u>See</u> <u>id.</u> at 248. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. <u>See</u> <u>id.</u> at 247-48.

If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Dixon v. State Farm Fire & Casualty Co.</u>, 799 F. Supp. 691 (S.D. Tex. 1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255.

## <u>THERE IS NO COVERAGE FOR THIS LOSS</u>

In its Complaint, The Continental Insurance Company has asked this Court to determine whether or not it is liable to Dr. Blumenthal for the claims made under the policy for the loss and damage to the vessel Blue Ace III.   A review of the insurance policy,   discovery and the sworn statement of Dr. Blumenthal provide uncontested evidence which  shows Dr.

LAW OFFICES OF UNDERWOOD, KARCHER & KARCHER, P.A.
THE ATRIUM - SUITE 235, 1500 SAN REMO AVENUE, CORAL GABLES,  FLORIDA 33146 • TEL. (305)661-2888

8

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

Blumenthal failed to report the loss of the vessel *as soon as practicable*.  This failure

prejudiced Continental, and led to thousands of dollars of costs in storage fees and the

unnecessary deterioration in the condition of the BLUE ACE III which requires more than

$40,000 in restoration costs.

      A contract of marine insurance in admiralty cases misinterpreted in accordance with

state law. See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310 (1955).  "In Florida,

coverage under an insurance contract is defined by the language and terms of the policy."

Swire Pac. Holdings Inc. v. Zurich Ins. Co., 845 So. 2d 161 (Fla. 2003) (quoting Siegle v.

Progressive Consumers Ins. Co., 788 So. 2d 355, 359 (Fla. Dist. Ct. App. 2001)).  The Court

continued, "In State Farm Mut. Auto. Ins. Co. v. Pridgen, 498 So. 2d 1245 (Fla. 1986), this

Court announced the rule to be followed in the interpretation of exclusionary clauses in

insurance policies: Exclusionary provisions which are ambiguous or otherwise susceptible to

more than one meaning must be construed in favor of the insured, since it is the insurer who

usually drafts the policy." Swire, 845 So. 2d at 165.  "However, 'only when a genuine

inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of

construction is the rule apposite.  It does not allow courts to rewrite contracts, add meaning

that is not present, or otherwise reach results contrary to the intentions of the parties.'" Id.

(quoting Excelsior Ins. Co. v. Pomona Park Bar & Package Store Co., 369 So. 2d 938, 942

(Fla. 1979)).  'Finally, we have consistently held that 'in construing insurance policies, courts

should read each policy as a whole, endeavoring to give every provision its full meaning and

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

operative effect.'" Id. at 166. (quoting Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34

(Fla. 2000)).  "Every insurance contract shall be construed according to the entirety of its

terms and conditions as set forth in the policy and as amplified, extended, or modified by any

application therefor or any rider or endorsement thereto." Id. (citing Fla. Stat. § 627.419(1)

(2002)).

There is no doubt that the terms and conditions of the Continental policy, including the

exclusionary provisions, are clear and unambiguous.  The policy states, **"[y]ou must give**

**notice of any loss as soon as practicable."**  (emphasis added)  The Supreme Court of Florida

has stated, "The notice requirement enables the insurer to conduct a timely and adequate

investigation of all circumstances surrounding an accident."  Bankers Insurance Company v.

Caridad Macias, 476 So. 2d 1216, 1217 (Fla. 1985).  If the insured breaches the notice

provision, prejudice to the insurer will be presumed, but may be rebutted by a showing the

insurer has not been prejudiced by the lack of notice.  Id., 1217-1218.   While the failure of the

insured to give timely notice of a loss in contravention of the policy may constitute a legal basis

for the denial of policy benefits, the insured may recover if he can show that the late notice did

not prejudice the insurer. Id. (quoting H.S. Equities, Inc. v. Hartford Accident & Indemnity

Co., 334 So.2d 573 (Fla.1976)); Ideal Mutual Ins. Co. v. Waldrep, 400 So. 2d 782 (Fla. Dist.

Ct. App. 1981).  A presumption of prejudice to the insurer exists and the burden is on the

insured to show that his late notice did not cause prejudice. Id. (quoting  Ideal Mutual, 400

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

So.2d at 785).  See also Mount Vernon Fire Ins. Co. v. Editorial America, S.A., 374 So.2d

1072 (Fla. Dist. Ct. App. 1979).

Defendant cannot show Continental was not prejudiced by the failure to notify it of the

missing boat in a timely manner.  During the period of time between July 14, 2002,  and

January 7, 2003, when the first notification of a claim was given to the insurance agent, the

boat was sitting in a boat yard, deteriorating and accruing storage charges.  These

circumstances prejudiced Continental substantially in its ability to investigate the loss.  Had the

facts of the loss been made known to Continental early on, the boat would have been easily

located by an insurance investigator and significant costs would have been avoided.  As such,

there is no way Dr. Blumenthal can claim there was no prejudice to his insurer by his failure to

report this loss.

And finally, the damages to the BLUE ACE III  are specifically excluded by the

unambiguous terms and conditions of the policy.  As shown previously, there is no coverage

for damage caused by deterioration, which is the primary cause of the damage to the boat.

Defendant has no claim under the policy for the costs of repair to the vessel.

Therefore, Plaintiff is moving for a dispositive ruling from this Court stating that The

Continental Insurance Company is not liable to the Defendant Blumenthal for the claims made

under the policy of insurance no. AYL5020334 for the damage and storage charges for the

BLUE ACE III.

### III. CONCLUSION

LAW OFFICES OF UNDERWOOD, KARCHER & KARCHER, P.A.
THE ATRIUM - SUITE 235, 1500 SAN REMO AVENUE, CORAL GABLES,  FLORIDA 33146 • TEL. (305)661-2888

11

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

The evidence, including the sworn statement by Dr. Blumenthal, and the notices of loss provided to Continental demonstrate there is no coverage for this loss. Dr. Blumenthal was aware on the date of the incident that his boat had been taken by an unauthorized user and grounded in Biscayne Bay. Within a few weeks of the grounding, Dr. Blumenthal was also aware that the BLUE ACE II was missing entirely. Neither the grounding nor the disappearance of the vessel were reported to Continental. As a result, the BLUE ACE III  sat unattended in a boat yard for almost a year before it was located, accumulating storage fees, and deteriorating from lack of maintenance, resulting in estimates of almost $30,000.00 for repairs to the hull and interior. Virtually all of the costs related to the storage and deterioration of the vessel could have been avoided if the loss had been reported when it was discovered. There is no doubt Continental has been prejudiced by the failure of Dr. Blumenthal to notify them of the loss as soon as practical and Plaintiff asks this court to find there is no coverage for the loss.

WHEREFORE, the Plaintiff, The Continental Insurance Company hereby requests this Court grant summary judgment in its favor and declare there is no coverage for the loss which occurred under policy no. AYL5020334.

Case No. 03-23315-CIV-LENARD
MAGISTRATE JUDGE SIMONTON

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

by mail to Walter S. Pesetsky, Esquire, of Pesetsky & Zack, P.A., Attorneys for Defendant, 17701

Biscayne Boulevard, Suite 200, Aventura, Florida 33160, on April ___*19*___, 2004.

Respectfully submitted,

UNDERWOOD, KARCHER & KARCHER, P.A.
Attorneys for Plaintiff
1500 San Remo Avenue, Suite 235
Coral Gables, Florida 33146
Telephone: (305) 661-2888
Facsimile: (305) 661-5888

By: _____
MICHAEL R. KARCHER
FLORIDA BAR NO. 516287

BLUMBA1                                                                    01/05/04

```
| Continental Insurance Company              711 W. 40th Street, Suite 356
| American Yachts, Ltd.                       Baltimore                          MD
|                                             21211              Phone:
```

Y A C H T   P O L I C Y   D E C L A R A T I O N S

NAMED INSURED:

Barry Blumenthal, DO.                    Policy #: AYI5020334
                                    Renewal of: AYI5020334
621 Island Road                     Agency Name: C & L Insurance, Inc.
Miami                          FL   Producer Code:
33137

We will provide the insurance described in this policy in return for the premium and compliance with the policy provisions.
Coverage is provided only where a Limit of Liability and Premium are shown:

POLICY PERIOD:  From: 10/18/02      To: 10/18/03      at 12:01 a.m., at place of issuance

| Year<br>Built | Length | Make | Model | Type | Total<br>H.P. | Hull I.D. | Yacht Name |
|-------|--------|------|-------|------|------|-----------|------------|
| 1994 | 40' | Mainship | Sedan HDG | Gas | T640 | MFC40224K394 | Blue Ace 3 |

| SECTION | COVERAGE | LIMIT OF LIABILITY | | DEDUCTIBLE | PREMIUM |
|---------|----------|--------|-----|-----------|---------|
| III. | Hull | $ 144,000 | | $ 4,320 | $ 1,798 |
| VI. | Protection & Indemnity | $ 500,000 | per occurrence | None | $ 315 |
| VI. | Longshoreman's & Harbor<br>Workers' Compensation | Included in Protection & Indemnity<br>if provided | | None | $ INCL |
| VII. | Medical Payments | $ 10,000 | per occurrence | None | $ INCL |
| X. | Trailer | $ 5,000 | per occurrence | $ | $ NIL |
| IV. | Personal Effects | $ 5,000 | per occurrence | $ 250 | $ INCL |
| V. | Commercial Towing & Assistance | $ 750 | per occurrence | None | $ INCL |
| VIII. | Uninsured Boaters | $ 500,000 | per occurrence | None | $ INCL |

OPTIONAL COVERAGES

| | | | | |
|--|--|--|--|--|
| Dinghy - | | $ | $ | $ NIL |
| Motor - | | $ | $ | $ NIL |
| Other - | | $ | $ | $ INCL |
| 3% Named Storm deductible | | | | |

                                                      TOTAL PREMIUM  $ 2,113

LOSS, if any, under Section III of this Policy shall be payable to the insured and:
None

LAY-UP WARRANTY:  Warranted that the Yacht shall be laid-up and out of commission:
From:            To:            Afloat [ ]  Ashore [ ]

MOORING LOCATION:

| Marina | City | ST | County |
|--------|------|-----|--------|
| Residence 33137 | Miami | FL | Dade |

NAVIGATION WARRANTY:
Inland and coastal waters from Eastport, Maine to Cedar Key, Florida
including the Bahamas.

THE POLICY CONSISTS OF THIS DECLARATIONS FORM, THE POLICY PROVISIONS AND THE FOLLOWING ENDORSEMENTS:
YF001 (01-01)  YF002 (01-01)  YF018 (01-01)
YF022 (01-01)  YF035 (01-01)  YF020 (01-01)

Countersigned this  18th  day of  Sept.   ,  2002

                                                    _____
                                                    Authorized Representative

*Yacht Policy*
*provided by*



## AMERICAN YACHTS
## MARINE INSURANCE PROGRAM
## 711 WEST 40TH STREET, SUITE 356
## BALTIMORE, MARYLAND 21211
## 410-243-2628



For All the Commitments You Make®

It is important that you read your entire policy carefully. The provisions of your policy are set forth in detail in the declarations, the policy wording, and any endorsements or forms that we issue.

Your policy provides you with various coverages. Be sure to look at your declarations to confirm the exact coverages and limits that you have purchased.

## *Your policy is a legal contract between you and the company.*
## *It is important that you read your entire policy carefully.*

YP001 (ED0101)

## INDEX

**SECTION I: GENERAL TERMS, CONDITIONS AND LIMITATIONS** (pages 1 - 4)
A. Definitions
B. Insuring Agreement
C. Limits of Liability
D. Policy Period
E. Change in Policy
F. Private Pleasure Use Only
G. Transfer of Interest
H. Cancelling This Policy
I. Return Premiums
J. Renewal of Coverage
K. Conformity to State Law
L. Broadening Coverage
M. Other Insurance
N. Lay-Up and Navigation Warranty
O. Suit Against Us
P. No Benefit to Others
Q. Concealment, Misrepresentation or Fraud
R. Inspection

**SECTION II: YOUR DUTIES AFTER A LOSS** (pages 4 - 6 )
A. Notice of Loss
B. Assistance in Loss Settlement – Protection & Indemnity or Medical Payments Coverage
C. Contractual Liability
D. Claims Against Others
E. Examination Under Oath
F. Proof of Loss – Physical Damage
G. Protection of Property – Physical Damage
H. Support of Claim

**SECTION III: COMMON POLICY EXCLUSIONS** (pages 6 - 7)
A. Dishonest or Illegal Acts
B. Intentional Acts
C. War, Confiscation, Nuclear Radiation
D. Racing
E. Land Transit
F. Unrepaired Damage

**SECTION IV: HULL COVERAGE** (pages 7 - 10)
A. What We Cover
B. What We Will Pay
C. Exclusions
D. Deductible
E. Salvage Charges
F. Equipment on Shore
G. Destruction Ordered by Authorities

**SECTION V: PERSONAL EFFECTS COVERAGE** (page 10)
A. What We Cover
B. What We Will Pay
C. Exclusions
D. Deductible

**SECTION VI: COMMERCIAL TOWING AND ASSISTANCE COVERAGE** (page 11)
A. What We Cover

**SECTION VII: PROTECTION & INDEMNITY COVERAGE** (page 11 - 12)
A. What We Cover
B. Exclusions
C. Limits of Liability

**SECTION VIII: MEDICAL PAYMENTS COVERAGE** (page 12)
A. What We Cover
B. Exclusions

**SECTION IX: SPILL LIABILITY COVERAGE** (page 13)
A. What We Cover
B. Exclusions
C. Limits of Liability

**SECTION X: UNINSURED BOATERS COVERAGE** (page 14)
A. What We Cover
B. Exclusions
C. Payment Considerations

**SECTION XI: NEWLY ACQUIRED BOAT COVERAGE** (page 15)
A. What We Cover
B. Exclusions

**SECTION XII: TRAILER COVERAGE** (pages 15 - 16)
A. What We Cover
B. What We Will Pay
C. Exclusions
D. Deductible

**SECTION XIII: LOSS SETTLEMENT CONDITIONS** (pages 16 - 17)
A. Loss Adjustment – Physical Damage
B. Arbitration – Physical Damage
C. Loss Payee
D. Reservation of Rights
E. Salvage
F. Abandonment of Property

# SECTION I

## GENERAL TERMS, CONDITIONS AND LIMITATIONS

Before you read the other Sections of your policy, the following are terms, conditions and limitations applicable to your entire policy that you need to know.

**A.     DEFINITIONS.**

Throughout this policy, "you," and "your" refer to the named insured shown in the declarations and your spouse who lives with you. "We," "us," and "our" refer to the Company providing this insurance. Certain words which require explanation are defined below or in the part of the policy where they are used.

"**Agreed value**" means the value of the covered property as shown in the declarations, without deduction for any depreciation.

"**Bodily injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

"**Direct physical loss**" means sudden and accidental property damage to your covered property.

"**Insured**" means (1) you; (2) a resident relative; and (3) any person or legal entity while operating your yacht with your permission and without a charge or fee. "Insured" does not include: (A) a paid captain or crew member; or (B) any person or organization operating, employed by, or the agent of a marina, boat repair yard, yacht club, sales agency, boat service station or other similar organization.

"**Latent defect**" means a defect in material or workmanship existing at the time of manufacture or building which is not discoverable by you by ordinary methods of testing.

"**Lay-up**" means taking your yacht out of active service. During the lay-up period shown in the declarations, your yacht cannot be used for any boating activities or as living quarters by you or any insured. Lay-up can include storage either on land or afloat.

"**Navigation warranty**" means the navigation area shown in the declarations and/or an endorsement.

"**Occurrence**" means a loss or accident, including continuous or repeated exposure to substantially the same general harmful conditions, during the policy period, which results in bodily injury or property damage.

"**Policy**" means this Policy, including the declarations and any endorsements.

"**Port risk**" means the vessel will be laid up and out of commission at a specific location. During the time it is laid up it is not ready for immediate use nor is it being lived on.

"**Property damage**" means the direct actual physical damage to or destruction of tangible property.

"**Resident relative**" means any person who lives with you who is related to you by blood, marriage

1

or adoption, or is a ward or foster child, or any other person under 21 years old in your care or in the care of your relative who lives with you.

"**Yacht**" means the vessel described in the declarations, including the hull, inboard machinery, out-drive units, spars, sails, fittings, furniture and permanently installed equipment on board and other equipment carried aboard that is normally required for the operation, navigation or maintenance of the yacht.

**B.    INSURING AGREEMENT.**

We agree to provide the insurance coverage described in the policy in return for your payment of the premium when due and compliance by you and any insured with all terms and conditions of this policy.

This policy is not complete or valid without the declarations signed by our authorized representative.

**C.    LIMITS OF LIABILITY.**

Unless otherwise stated in this policy or any endorsements, the limits of liability shown in the declarations are the most we will pay for all damages or claims resulting from any one occurrence.

**D.    POLICY PERIOD.**

This policy applies only to a covered loss which occurs during the policy period as shown in the declarations.

**E.    CHANGE IN POLICY.**

This policy contains all of the agreements between you and us.  Its terms may not be changed or waived except by endorsement issued by us.

**F.    PRIVATE PLEASURE USE ONLY.**

Coverage under this policy applies only if your yacht is used for private pleasure purposes, including recreational boating and leisure time activities.  There is no coverage if your yacht is used for charter, hire, to carry persons or property for a fee or for any other commercial use unless prior written consent has been obtained by us.  There is no coverage if your yacht is used for any unlawful purpose with your knowledge and consent.

**G.    TRANSFER OF INTEREST.**

All coverage provided by us will terminate upon the sale, repossession, bankruptcy, assignment, pledge or transfer of your ownership or insurable interest in the covered property unless prior written consent has been obtained from us.  However, if you should die during the policy period, we will automatically cover your legal representatives as the named insured with respect to their interest in your covered property.  The yacht must be port risk until approved by us.

**H.    CANCELLING THIS POLICY.**

**Your cancellation.**  You may cancel this policy at any time by returning it to us or our authorized agent stating the future date you want it to be cancelled.

**Our cancellation.** If you have paid the premium when due and we decide to cancel this policy, we will give the first named insured at least 30 days written notice of our decision to cancel this policy. If you have not paid the premium when due, we may cancel this policy upon 10 days written notice to the first named insured. Evidence of mailing of our cancellation notice to the first named insured at the address shown in the declarations shall be sufficient proof that you have been notified.

## I.   RETURN PREMIUMS.

If this policy is cancelled, you may be entitled to a premium refund. If we cancel the policy, any return premium will be computed on a pro-rata basis. If you cancel the policy, any return premium will be computed on a 90% of pro-rata basis. No premiums will be returned to you if we have paid you for a total or constructive total loss of the yacht insured under this policy. Any return will be paid to the first named insured as soon as reasonably possible after the cancellation.

## J.   RENEWAL OF COVERAGE.

**Renewal.** We may offer to continue this policy by providing you a renewal declarations along with a bill for the premium. Any changes in the policy will be shown in the renewal declarations.

**Nonrenewal.** If we decide not to renew this policy, we will give you at least 45 days notice of our decision not to renew. Evidence of mailing of our nonrenewal notice to the first named insured at the address shown on the declarations shall be sufficient proof that you have been notified.

## K.   CONFORMITY TO STATE LAW.

When a policy provision conflicts with the law of the state in which this policy is issued, the minimum requirements of the state law will automatically apply.

## L.   BROADENING COVERAGE.

If we adopt any change during the term of this policy applicable to all policyholders which broadens coverage without additional premium, the broader coverage will automatically apply to your policy.

## M.   OTHER INSURANCE.

If, at the time of loss or damage, there is any other insurance applicable that would cover the loss in the absence of this policy, then coverage under this policy shall be excess coverage over all other valid and collectible insurance. If all other applicable insurance also covers on only an excess basis, we will pay only that proportion of the loss or damage that the limit of liability under this policy bears to the total limits of liability under all applicable insurance.

If we provide insurance for loss or damage under two or more coverages or policies, we will not pay more than the limits of the coverage or policy having the highest limits.

## N.   LAY-UP AND NAVIGATION WARRANTY.

**Events Beyond Your Control.** If the lay-up or navigation warranty shown in the declarations is breached due to events beyond your control, coverage for your yacht will continue provided you

3

give us written notice of the breach within 10 days after you learn of the breach and pay any additional premiums due us for this extension of coverage.

**Events Within Your Control.** If the lay-up or navigation warranty shown in the declarations is breached due to events within your control, there shall be no coverage under this policy without prior notice to us and approval by us.

**Lay-up requirements.** If the yacht is to be laid up and out of commission for a period shown in the declarations:

1. It must be in a safe berth for storage, ashore or afloat;

2. It must not be ready for immediate use;

3. It must not be used for living on board; and

4. It must not be navigated.

**O.   SUIT AGAINST US.**

No action will be brought against us unless there has been full compliance with all policy provisions and such action is started within one year after loss or damage occurs.

**P.   NO BENEFIT TO OTHERS.**

No person or organization which has custody of your insured property and is to be paid for service will benefit from this insurance.

**Q.   CONCEALMENT, MISREPRESENTATION OR FRAUD.**

This coverage provided by this policy depends on the statements you made in your application. If you or any insured conceals or misrepresents any material fact or circumstance, whether before or after a loss, this policy is void.

**R.   INSPECTION.**

We have the right, but not the duty, to inspect any covered property and your records, including the ship's log, during and for one year after your policy period.

**SECTION II**

**YOUR DUTIES AFTER A LOSS**

**A.   NOTICE OF LOSS.**

1. You must give notice of any loss as soon as practicable to either your agent or us. If the loss is by theft or vandalism, you must also notify the police authority having jurisdiction.

2. We must be told: (a) the name of the insured; (b) your policy number; (c) all details of

4

the loss including where and how the event occurred; and (d) the name and address of any witness.

3. On losses involving Protection & Indemnity, Uninsured Boaters or Medical Payments Coverage, you must: (a) tell us the names and addresses of all claimants and witnesses; and (b) promptly send us all notices or legal papers relating to the loss.

**B.   ASSISTANCE IN LOSS SETTLEMENT – PROTECTION & INDEMNITY OR MEDICAL PAYMENTS COVERAGE.**

1. You must help us: (a) settle all claims; (b) enforce our rights when others may be liable; and (c) furnish medical reports and submit to physical examinations by physicians selected by us.

2. At our request, you must: (a) attend hearings and trials; (b) secure and give evidence; and (c) make every effort to obtain attendance of witnesses.

**C.   CONTRACTUAL LIABILITY.**

We will not provide coverage if you, without our written consent: (a) assume any liability unless liability would have existed in the absence of such assumption; (b) incur any expense for which we may not be liable; or (c) impair our right to recover claims against others.

**D.   CLAIMS AGAINST OTHERS.**

If we believe a claim may be recovered from others, we may pay you and assume your rights to such recoveries.  In this event:

1. You agree: (a) not to waive, after loss, any rights you may have against others; and (b) to assist us in all ways possible to recover amounts paid under the policy.

2. We may: (a) at our own expense, take over your rights to the extent of our payment; and (b) retain or collect all premiums paid or due.

**E.   EXAMINATION UNDER OATH.**

You must: (1) submit to questioning under oath as often as we may reasonably require; and (2) assist us in securing testimony from others.

**F.   PROOF OF LOSS – PHYSICAL DAMAGE.**

You must send us, within 60 days after we ask,  a statement sworn to the best of your knowledge and belief, listing:

1. The time and cause of loss;

2. The interest of anyone in the covered property;

5

3. All liens and mortgages on the covered property;

4. Other insurance that may cover the loss;

5. Title changes;

6. Detailed estimates of the value of the covered property and for the repair of damage; and

7. Evidence of the amount of loss, including affidavits.

## G.   PROTECTION OF PROPERTY – PHYSICAL DAMAGE.

If a loss occurs, you must take all lawful, reasonable steps, including making necessary temporary repairs, to protect the covered property from further damage. We will share the reasonable expense incurred in proportion to our interests, but the most we will pay for protecting damaged property is the coverage limit of liability that applies to that property. However, we will not pay for your labor or personal expense.

## H.   SUPPORT OF CLAIM.

You must support any claim by: (1) producing the property or its remains for our examination; (2) producing records to verify the claim and its amount; (3) permitting copies of records to be made, and (4) cooperating with and assisting us in any investigations.

### SECTION III

### COMMON POLICY EXCLUSIONS

**The following exclusions apply to all coverages provided under this policy.**

## A.   DISHONEST OR ILLEGAL ACTS.

We do not cover any loss or damage caused by the dishonest or illegal acts of any insured, regardless of whether or not such person is convicted of such act by a criminal court.

## B.   INTENTIONAL ACTS.

We do not cover any loss or damage which is intentionally caused by any insured.

## C.   WAR, CONFISCATION, NUCLEAR RADIATION.

We do not cover any loss or damage caused by:

1. War, including undeclared war, civil war, insurrection, rebellion, revolution, war-like act by military force or military personnel, destruction or seizure for a military purpose or any consequences of these actions;

2. The lawful or unlawful capture, seizure, confiscation, requisition or detainment of your yacht by a civil or military authority or an attempt at any of these; or

3.  Nuclear reaction, radiation or radioactive contamination, no matter how caused.

**D.    RACING.**

We do not cover any loss that occurs or damage that results while your yacht is being used in any capacity in an official race or speed test.  However, this exclusion does not apply to sailboats, predicted log events or committee boats officiating at any of these sanctioned races.

**E.    LAND TRANSIT.**

We do not cover any loss or damage on vessels being transported for hire and/or by Commercial carrier for any distance greater than a 50 mile radius from the home port or storage location, unless prior written consent has been obtained from us.

**F.    UNREPAIRED DAMAGE.**

We do not cover any previously unrepaired or improperly repaired damage resulting from excluded perils, or any damage which occurred either prior to the policy effective date shown in the declarations or where you or any insured has previously received payment.

SECTION IV

HULL COVERAGE

**A.    WHAT WE COVER.**

We cover the following property against accidental direct physical loss:

1.  Your yacht scheduled in the declarations.

2.  Your outboard motors scheduled in the declarations, including:

   (a)  portable fuel tanks and fuel lines;
   (b)  electric starting equipment (including batteries); and
   (c)  controls supplied by the manufacturer as part of the outboard motor.

3.  Your auxiliary equipment consisting of boating equipment not permanently installed, but normally required and used to operate and maintain your covered yacht.  However, auxiliary equipment does not include:

   (a)  outboard, trolling or auxiliary motors, which must be scheduled separately in the declarations;
   (b)  personal watercraft such as hydrocycles, jet skis, or similar types of vessels;
   (c   boat houses, boat sheds, moorings, boat lifts, or similar apparatus used for the mooring or storage of your covered yacht; or
   (d)  personal items which are not intended for the normal operation and use of your yacht including portable televisions, stereos, radios, cellular or portable phones and cameras.

4.  Your dinghy including its outboard motor provided:  (a) it is used primarily to travel to

7

and from the mooring of your covered yacht; and (b) it does not exceed 13 feet in overall length and 25 horsepower.

**B.    WHAT WE WILL PAY.**

   **This is an "agreed-value" policy.**

   In the event of a covered loss, we will pay as follows:

   1. **Total loss.** If the yacht is totally destroyed or lost, we will pay the agreed value without deduction for depreciation. A yacht is considered totally destroyed when the reasonable expense of recovering and repairing it exceeds the amount of coverage. A yacht is considered lost when it is not found within 30 days of the date it is reported missing. You must surrender clear title to the yacht at our request, but you cannot abandon it to us.

   2. **Partial loss.** Unless otherwise stated in this policy, we will pay the reasonable cost of replacement of damaged or stolen property without deducting any amount for depreciation, or (b) repair of damaged property to its condition just prior to the loss, whichever is less.

   3. **Property subject to depreciation.** We will only pay the actual cash value at the time of loss or damage to the following property:

      (a)  sails (including spinnakers);

      (b)  protective covers consisting of fabric, plastic, canvas or similar materials;

      (c)  batteries;

      (d)  outboard motors 5 years old and over;

      (e)  outdrive units 5 years old and over;

      (f)  machinery (including inboard engines and equipment) 10 years old and over;

      (g)  personal property; and

      (h)  dinghy 5 years old and over.

   Actual cash value shall be determined by the replacement cost of the covered property at the time of loss or damage, less deduction for any depreciation.

   4. **Pairs, Sets or Parts.** In case of loss or damage to a pair or set, we may repair or replace any item to restore the pair or set to its value just before the loss, or pay the difference between  the actual cash value of the pair or set before and after the loss. In case of loss to any part or covered property consisting of several parts when complete,  we will pay only for the value of the part lost or damaged.

   5. **Repairs.** If your yacht needs repair after a covered loss, we will pay the reasonable costs of repairs made in accordance with:

      (a)  The manufacturer's specifications; or

(b)   Generally accepted repair practices.

If one side of the hull of the yacht is damaged and recoating or repairing is necessary, we will pay only to recoat or repaint the damaged side.

6. **Limit of Liability.**  We will not pay more than our limit of liability, as set forth in the declarations, for your covered property.

## C.   EXCLUSIONS.

**We do not provide hull coverage for:**

1. The cost of replacing or repairing an item having a manufacturer's defect, defect in design, latent defect, mechanical breakdown or failure and/or damage resulting from wear and tear; however this exclusion does not apply to damage to covered property resulting from any fire, sinking, demasting, collision or stranding unless such damage is otherwise excluded from this policy;

2. Gradual deterioration (including deterioration caused by weathering, insect, mold, animal, vermin or marine life);

3. Marring, chipping, scratching, fading or denting;

4. Inherent vice (including wet or dry rot, rust or corrosion);

5. Osmosis, blistering, delamination or electrolysis;

6. Delay or loss of use; or

7. Lack of reasonable care or due diligence in the maintenance of the covered property.

## D.   DEDUCTIBLE.

We will adjust each claim for a covered loss to your covered property separately.  The amount of each adjusted claim will be automatically reduced by the deductible amount shown in the declarations, except if there is a total loss to your yacht.  We will treat any two or more covered losses resulting from the same occurrence as one claim.

## E.   SALVAGE CHARGES.

We will pay for salvage charges attempted or otherwise that you incur arising from a covered loss, but not to exceed the insured value of your yacht.

## F.   EQUIPMENT ON SHORE.

We will cover your auxiliary equipment when it is temporarily removed from your yacht for storage on shore.  The most we will pay is 20% of the hull limit.  However, the amount of insurance on the yacht will be automatically reduced by the total value of this equipment while it is stored away from your yacht.

G.   **DESTRUCTION ORDERED BY AUTHORITIES.**

We will pay for covered property which must be destroyed to retard the spread of fire if destruction is ordered by any civil authority.

## SECTION V

## PERSONAL EFFECTS COVERAGE

A.   **WHAT WE COVER.**

We cover against accidental direct physical loss of the personal property which is owned by you, a resident relative or a guest while it is aboard your yacht, or being loaded or unloaded.

B.   **WHAT WE WILL PAY.**

In the event of a covered loss, we will pay the actual cash value of covered property at the time of loss or the reasonable cost of repair of damaged property to its condition just prior to the loss, whichever is less. Actual cash value shall be determined by the replacement cost of the covered property at the time of loss, less deduction for any depreciation.

C.   **EXCLUSIONS.**

**We do not provide personal effects coverage for:**

1. Firearms, cameras, watches, car or cellular phones, jewelry, costume jewelry, furs, china, silver, collectibles, antiques, computer software and/or hardware, fine arts, liquor or consumables;

2. Money, coins or currency, traveler's checks, securities, evidences of debt, passports, or valuable papers or documents;

3. Motor vehicles or any property which is separately described and specifically insured, in whole or in part, by this or any other insurance;

4. Wear, tear, gradual deterioration or corrosion;

5. Changes in temperature or humidity;

6. Any mechanical or electrical breakdown, failure or disturbance unless it was caused by lightning; or

7. Theft or unexplained disappearance of covered property unless there are visible signs of forcible entry or removal, or the entire yacht is stolen.

D.   **DEDUCTIBLE.**

We will adjust each claim for a covered loss to your covered personal property separately. The amount of each adjusted claim will be automatically reduced by the deductible amount shown on the declarations except if there is a total loss to your yacht. We will treat any two or more covered losses resulting from the same occurrence as one claim.

10

**SECTION VI**

**COMMERCIAL TOWING AND ASSISTANCE COVERAGE**

**A.    WHAT WE COVER.**

We will provide coverage as scheduled in your declarations in the event there is an emergency situation where your yacht is disabled.  We will reimburse you for the reasonable costs you incur resulting from the following services to your yacht if help is not available and you must obtain commercial assistance:

1.  Towing to the nearest place where necessary repairs can be made; or

2.  Delivery of fuel, oil, parts or loaned battery (excluding the cost of these items themselves) or emergency labor while away from safe harbor.

**SECTION VII**

**PROTECTION & INDEMNITY COVERAGE**

**A.    WHAT WE COVER.**

We will pay damages for bodily injury or property damage for which an insured is legally responsible because of owning, maintaining or using your covered yacht.

We will cover liability for which an insured is legally responsible under the United States Longshoremen's and Harbor Workers' Compensation Act or Jones Act.

If you are legally obligated to remove or otherwise dispose of the wreck of your yacht, we will pay the reasonable cost of removal or the amount for which you are held liable for failure to dispose of the wreck.

We will also cover your legal liability as an individual for boats and motors used with the owner's permission which are not owned (wholly or partially), furnished, hired or chartered, or available for regular use by you or any insured, subject to the limits of the policy.

**B.    EXCLUSIONS.**

**We do not provide protection and indemnity coverage for:**

1.  Liability which has been assumed by you or any insured under any contract or agreement;

2.  Liability to you and your spouse, or any resident relative, other than what is provided in this section under paragraph C., Limits of Liability.

3.  Liability of any insured to you or a resident relative;

4.  Any bodily injury or property damage liability arising out of the transportation of your yacht on land;

11

5. Any bodily injury or property damage arising out of the operation or use of any personal watercraft such as a jet ski, hydrocycle or similar type watercraft;

6. Any claim for punitive damages;

7. Any fines, penalties or costs of defense arising out of a criminal or civil violation of law or assessment by a governmental authority;

8. Injuries for which benefits are required to be provided or are available under any state or federal compensation law or act; or

9. Any liability, loss, damage, cost, expense, fine, payment, equitable relief, equitable remedy, or penalty of any nature, statutory or otherwise, incurred by or imposed on any insured, directly or indirectly, with respect to the actual, alleged, threatened or potential discharge, emission, spillage or leakage of oil, fuel, petroleum products, chemicals or other substances of any kind into waters, land or air.

## C.   LIMITS OF LIABILITY.

We will pay only up to our limit of liability for any one occurrence.  We will settle or defend, as we consider appropriate, any claim or suit asking for these damages.  Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted.  Our limit of liability for any claim or number of claims against an insured by a spouse or resident relative shall be limited to $25,000 for any one accident, or series of accidents arising out of the same event.

### SECTION VIII

### MEDICAL PAYMENTS COVERAGE

## A.   WHAT WE COVER.

We will pay for reasonable medical, ambulance, hospital, professional nursing and funeral costs which become necessary due to accidental bodily injury.  This coverage is provided only for persons injured while in, upon, boarding or leaving your insured yacht.  We will pay for only those costs incurred within one year of the date of accident.

## B.   EXCLUSIONS.

**We do not provide medical payments coverage for:**

1. Responsibility assumed by you or any insured under any contract or agreement;

2. Anyone who is injured while the yacht is being transported overland, hauled out or launched;

3. Injury to a trespasser on your yacht;

4. An insured's employees or a paid captain or crew; or

5. Injuries for which benefits are required to be provided or are available under any state or federal compensation law or act.

12

## SECTION IX

## SPILL LIABILITY COVERAGE

**A.      WHAT WE COVER.**

We will pay for the containment, clean-up and resulting property damage and assessments related to any Fuel Spill from your covered yacht for which any insured becomes legally responsible because of owning, maintaining or using your covered yacht. We will settle or defend, as we consider appropriate, any claim or suit asking for these covered expenses and/or damages. We will also pay for an attorney we select to defend you. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted.

**"Fuel Spill"** means the unintentional discharge, spillage, leakage or emission of petroleum products, chemicals or other substances.

This coverage will not apply if an insured fails or refuses:

1. To report the incident giving rise to liability as required by law and the insured knows or has reason to know of the incident; or

2. To provide all reasonable cooperation and assistance requested by a responsible official in connection with containment and clean-up activities.

**B.      EXCLUSIONS.**

**We do not provide spill liability coverage for:**

1. Liability which has been assumed by you or any insured under any contract or agreement;

2. Liability arising out of the transportation or storage of your yacht on land;

3. Liability caused by or resulting from an intentional act or willful misconduct of an insured;

4. Liability for punitive damages, fines, penalties or costs of defense arising out of a criminal or civil violation of law;

5. Liability arising out of the discharge, spillage, leakage or emission of any radioactive material or substance of any kind; or

6. Liability for bodily injury.

**C.      LIMITS OF LIABILITY.**

Regardless of the number of insureds, claims made, or boats involved, we will pay only up to **$500,000** for any one accident, or series of accidents arising out of the same event. Our limit of liability for any claim or number of claims against an insured by a spouse or resident relative shall be limited to **$25,000** for any one accident, or series of accidents arising out of the same event.

13

**SECTION X**

**UNINSURED BOATERS COVERAGE**

A.    **WHAT WE COVER.**

We will pay damages which you or a resident relative are legally entitled to recover, while on the boat insured by this policy, from the owner or operator of an uninsured boat because of bodily injury caused by an accident.   The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the uninsured boat.

"Uninsured boat" means a boat that does not have a bodily injury policy in force or, if the policy is in force, the insurer denies coverage or becomes insolvent.  It also refers to a hit-and-run boat whose operator or owner cannot be identified.

An uninsured boat does not include a boat:

1.  Owned by, furnished, or available for the regular use of you or a resident relative; or

2.  Owned by any governmental unit or agency.

B.    **EXCLUSIONS.**

**We do not provide uninsured boaters coverage:**

1.  For any person struck by a boat owned by you or a resident relative;

2.  If any person or legal representative settles the bodily injury claim without our written request;

3.  To benefit any insurer or self-insurer under any workers' or workmen's compensation, disability benefits or similar law;

4.  For an insured using the yacht without permission; or

5.  Where no evidence of physical contact exists between your yacht and an uninsured boat.

C.    **PAYMENT CONSIDERATIONS.**

Payment under this coverage shall be reduced by:

1.  All sums paid by or on behalf of those legally responsible;

2.  All sums paid by any state or federal compensation law or act; or

3.  Alll sums paid under the Boating Liability or Medical Payments coverage of this policy.

SECTION XI

## NEWLY ACQUIRED BOAT COVERAGE

**A.     WHAT WE COVER.**

A newly acquired boat and/or motor, provided it is reported to us within 15 days of acquisition, it is an acceptable risk to us, and you pay any additional premium required.  The hull coverage shall not exceed the purchase price of the newly acquired boat or $100,000, whichever is less.

**B.     EXCLUSIONS.**

We do not provide coverage for newly acquired boats and/or motors that are more than 10 years old.

SECTION XII

## TRAILER COVERAGE

**A.     WHAT WE COVER.**

We cover your trailer against accidental physical loss provided that:

1.  The trailer is scheduled in the declarations or as an endorsement to this policy;

2.  The trailer is designed and used solely for over-highway transportation of your yacht or dinghy; and

3.  The trailer is within the Continental United States or Canada.

**B.     WHAT WE WILL PAY.**

In the event of a covered loss, we will pay the actual cash value of covered property at the time of loss or damage or the reasonable cost of repair of damaged property to its condition just prior to the loss, whichever is less.  Actual cash value shall be determined by the replacement cost of the covered property at the time of loss or damage, less deduction for any depreciation.

**C.     EXCLUSIONS.**

**We do not provide trailer coverage for:**

1.  Wear and tear;

2.  Gradual deterioration (including deterioration caused by weathering, insect, mold, animal, vermin or marine life);

3.  Marring, chipping, scratching, fading or denting;

4.  Inherent vice (including wet and dry rot, rust or corrosion);

15

5. The cost of replacing or repairing an item having a manufactures defect, defect in design or latent defect; however, this exclusion does not apply to resulting damage to other covered property unless such damage is otherwise excluded from this policy;

6. Any mechanical or electrical breakdown, failure or disturbance unless it was caused by lightning;

7. Delay or loss of use;

8. Lack of reasonable care or due diligence in the maintenance of the covered property; or

9. The yacht exceeding the registered weight capacity of your covered trailer.

**D.   DEDUCTIBLE.**

We will adjust each claim for a covered loss to your covered property separately.  The amount of each adjusted claim will be automatically reduced by the deductible amount shown on the declarations.  We will treat any two or more covered losses resulting from the same occurrence as one claim.

## SECTION XIII

## LOSS SETTLEMENT CONDITIONS

**A.   LOSS ADJUSTMENT – PHYSICAL DAMAGE.**

We may pay for the loss in money or repair or replace the damaged property according to the Repairs clause contained in Section IV.  We will notify you of our choice within 30 days after you submit Proof of Loss.

**B.   ARBITRATION – PHYSICAL DAMAGE.**

If you and we fail to agree on the amount of physical damage, you and we may each select a competent, impartial appraiser in order to reach a mutual agreement.  You and we will share the expenses incurred equally.  These appraisers should make every effort to reach an agreement within a reasonable time.

**C.   LOSS PAYEE.**

If a loss payee is named in this policy, any loss payable will be paid to the loss payee and you, as interests appear.  We cover the interests of the loss payee, unless the loss results from fraudulent acts or omissions on your part.

**D.   RESERVATION OF RIGHTS.**

When we investigate, compromise or pay any claim, it shall not be construed to admit liability either by you or us.

E        SALVAGE.

If we have made payment under this policy for loss or damage and if there is salvage or recovery as a result of that loss or damage, we have the right to recover that salvage to the extent of our payment.

F.       ABANDONMENT OF PROPERTY.

We are not liable for any property abandoned by an insured.

**This policy shall not be valid unless signed below by our secretary and president and countersigned on the Declarations Page by our authorized representative.**

_Jonthan Lawton_
     Secretary

_Bernard L. Hugebaugh_
     President

17

# Report any Accident or Potential Claim Immediately to Our Claims Managers At:

## 1-888-262-8555
### Fax 703-461-4669

## American Yachts, Ltd.
## Claims Division, P.O. Box 22657
## Alexandria, VA 22304

1          EXAMINATION UNDER OATH

2

3

4

5

6     IN RE:                    )

7     BARRY BLUMENTHAL, M.D.     )          ORIGINAL

8                               )

9     _____ )

10

11

12

13

14              17701 Biscayne Boulevard

15              Miami, Florida

16              August 15, 2003

17              1:47 p.m.  -  2:24 p.m.

18

19     Examination Under Oath of Barry Blumenthal, M.D.

20

21          Taken before Stan Seplin, Certified Shorthand

22     Reporter and Notary Public in and for the State of

23     Florida at Large.

24                    EXHIBIT
                        2
25

APPEARANCES:


     ON BEHALF OF THE WITNESS:


         Law Offices of Walter Pesetsky
         17701 Biscayne Boulevard
         Suite 200
         Aventura, Florida
         BY:  Walter Pesetsky, Esq.

     ON BEHALF OF AMERICAN YACHTS:

         Underwood, Karcher & Karcher, P.A.
         1500 San Remo
         Suite 235
         Coral Gables, Florida 33146
         BY:  Michael Karcher, Esq.


                    I N D E X

WITNESS                 EXAMINATION
BARRY BLUMENTHAL, M.D.
BY MR. KARCHER              3

```
 1    Thereupon:
 2                    Barry Blumenthal, M.D.
 3    by me being first duly sworn, was examined and
 4    testified as follows:
 5                         EXAMINATION
 6    BY MR. KARCHER:
 7         Q.   Could you please state your name, sir.
 8         A.   My name is Barry Michael Blumenthal.
 9         Q.   Mr. Blumenthal or Doctor Blumenthal, my
10    name is Michael Karcher. As I introduced myself
11    before, I'm a local attorney working for American
12    Yachts, Limited. We're going to take an examination
13    under oath in accordance with your policy of
14    insurance.
15              If there's anything I ask you that you
16    don't understand, please stop me and ask me to
17    repeat it, and please speak up enough for the court
18    reporter, who is right next to you, so he can hear
19    what you have to say.
20              What's your address, sir?
21         A.   621 Island Road, Miami, Florida 33137.
22         Q.   And your occupation?
23         A.   Physician.
24         Q.   We are here today to talk about the
25    boat, the BLUE ACE III.
```

```
 1              I understand you own that vessel?

 2         A.   Yes, I do.

 3         Q.   You purchased it new in 1994, I believe?

 4         A.   Yes.

 5         Q.   What type of vessel is the BLUE ACE?

 6         A.   It's a 42 foot Mainship flybridge sedan.

 7         Q.   Did you buy it new?

 8         A.   Yes.

 9         Q.   Do you recall the purchase price,

10    roughly?

11         A.   160 some odd thousand, something of that

12    nature.

13         Q.   Is the boat a Florida registered vessel,

14    or a U.S. documented vessel?

15         A.   It's a U.S. documented vessel, and it

16    was registered in Florida, also.

17         Q.   Is the documentation still current?

18         A.   Yes.

19         Q.   Under the name of BLUE ACE III?

20         A.   Correct.

21         Q.   Roman numeral three?

22         A.   Roman numeral three.

23         Q.   Where did you keep the vessel, sir, or,

24    let me start, where did you keep the vessel up until

25    June of 2002?
```

```
 1          A.   After purchasing the boat, I kept the
 2   vessel at my friend's house, which is in Keystone
 3   Point.
 4               Moving to Bay Point, there was no safe
 5   dockage.
 6               I had had it in Maul Lake for some time
 7   after moving.
 8          Q.   Maul Lake Marina, just down the street?
 9          A.   Yes.
10          Q.   On Biscayne Boulevard?
11          A.   Yes. After there, I moved it to the Palm
12   Bay Club.
13          Q.   And in June of 2002, was that where it
14   was kept, the Palm Bay Club?
15          A.   Correct.
16          Q.   All right. Besides yourself, who
17   operated the vessel, or did you-- well, let me start
18   again.
19               Did you own it, by yourself?
20          A.   No. My wife, I believe, is on the title
21   to the boat, also.
22          Q.   Besides yourself and your wife, did
23   anyone else regularly operate the vessel?
24          A.   No.
25          Q.   At the Palm Bay Club, where it was kept,
```

1    did the dock manager of the marina-- the marina

2    manager, keep the keys to the vessel?

3         A.   The keys to the vessel, a copy was with

4    the dock manager and a copy was hidden in a safe

5    place on the boat.

6         Q.   Did you have any regular mechanics or

7    persons doing maintenance on the boat?

8         A.   Yes.

9         Q.   Who was that, sir?

10        A.   A gentleman named Marvin Warhaftig.

11        Q.   Does Mr. Marvin Warhaftig--

12   W-a-r-h-a-f-t-i-g?

13        A.   Yes.

14        Q.   Is he with the "Corvair Haven Marine"?

15        A.   Yes.

16        Q.   Was he a regular mechanic on it?

17        A.   Yes.

18        Q.   How often did he service the vessel?

19        A.   At least twice a year, and before it was

20   moved to the Palm Bay Club, he was-- the major

21   maintenance was done by him.

22        Q.   Anyone else do regular maintenance on

23   the boat?

24        A.   No.

25        Q.   I'm here today to talk about a claim

```
 1   that was paid for a loss on June 2, 2002.

 2          A.    Yes.

 3          Q.    At that time, where was the boat being

 4   kept?

 5          A.    At the Palm Bay Club.

 6          Q.    Were you in-- at the Palm Bay Club or in

 7   Miami at that time?

 8          A.    I was in Miami.

 9          Q.    All right. On the date of the reported

10   loss, where were you, sir?

11          A.    Working in the hospital.

12          Q.    When you say the hospital, which

13   hospital?

14          A.    Aventura.

15          Q.    Was someone else operating the vessel

16   that day?

17          A.    Yes.

18          Q.    Who was that?

19          A.    Doctor Alton Ingram.

20          Q.    And how did Doctor Ingram come to be

21   operating the boat that day?

22          A.    Doctor Ingram had moved to the Palm Bay

23   Club, and being a unit owner, renter, he had a

24   privilege to dock the boat there. I docked my boat

25   there because he lived there.
```

1           Doctor Ingram had access to keys to the
2    boat. He would check the boat for me regularly.
3           Q.    Because the boat was-- because he lives
4    there, he gets first shot at dock space at the Palm
5    Bay Club?
6           A.    Yes.
7           Q.    And the outsiders dock their boats at
8    the--
9           A.    I don't think so at the time.
10           Q.    Did Doctor Ingram have regular boating
11    privileges for the BLUE ACE III?
12           A.    No.
13           Q.    Was there something special with that
14    day, or did you make arrangements for him to use the
15    boat that day?
16           A.    No.
17           Q.    Did you know he was using the boat that
18    day?
19           A.    No.
20           Q.    To the best of your knowledge, had he
21    ever operated the boat before June 29, 2002?
22           A.    No.
23           Q.    Have you come to learn since that date,
24    that he had operated it before that date?
25           A.    No.

1        Q.   So as far as you know, this is the only

2  time he's run the boat or taken the boat out?

3        A.   Yes.

4        Q.   Do you know if there was anyone else

5  with him at that time?

6        A.   Yes.

7        Q.   Who?

8        A.   A girlfriend--

9        Q.   His girlfriend, I assume?

10       A.   His girlfriend, and I believe two other

11  people, it was my recollection at the time.

12       Q.   How did you come to learn who was on the

13  boat at that time?

14       A.   Doctor Ingram had called me in a panic

15  after he had grounded the boat, and asked me if I

16  had any kind of privileges for towing, any kind of

17  stuff like that.

18        At that time I asked him what happened

19  and who was with him on the boat, and he told me he

20  was with his girlfriend and a couple of other

21  ladies.

22       Q.   All right. Did he call you from the

23  boat, itself, while this was happening?

24       A.   I believe, yes.

25       Q.   You were at the hospital and I assume

1    your cell phone rings and he's calling you from his

2    cell phone and saying, here's what happened?

3         A.    Correct.

4         Q.    And specifically, do you recall what he

5    told you, where he was, and what was happening?

6         A.    First thing was, he apologized. He asked

7    me if I had towing services, I said yes, quote,

8    unquote, thank God.

9              I then asked him, using-- using the

10   expletives, and he told me he just took it for a

11   ride, and being unfamiliar probably with Florida

12   waters, he was in a place he shouldn't have been, he

13   grounded the boat.

14             I told him I had Sea Tow. I said, I will

15   take care of it, and he said, I'm sorry, and we left

16   it at that.

17        Q.    Do you recall where he told you he was?

18        A.    Somewhere near Rickenbacker Causeway.

19        Q.    South of the bridge, north of the

20   bridge?

21        A.    I believe it was south of the bridge.

22        Q.    After he called you and told you that he

23   would take care of it, when did you next hear from

24   him regarding the vessel?

25        A.    I called him a couple of hours later on

```
1   his cell phone to find out the status, and I was

2   told that he was waiting for Sea Tow to come, that

3   he would stay with the boat and make sure it got

4   back to safe dockage, and would handle any and all

5   repair bills associated with the grounding.

6           Q.   All right. You said you had a policy

7   with Sea Tow?

8           A.   No. I had a policy with Boat USA.

9           Q.   Okay. And when you say a policy, are you

10  talking about one of those tow boat policies?

11          A.   Towing, extra coverage for towing.

12          Q.   Okay. Did you-- and besides the normal

13  or the insurance policy on the vessel with American

14  Yachts, did you have any other type of coverages,

15  besides American Yachts and that tow boat-- Boat USA

16  towing policy?

17          A.   No.

18          Q.   You didn't have one with Sea Tow, I

19  assume?

20          A.   No.

21          Q.   When did you next hear from Doctor

22  Ingram, as to what had happened that day?

23          A.   I don't recollect exactly.

24               Maybe a-- three, four weeks later. I

25  don't recall exactly when.
```

```
 1            Q.    When did you next see the vessel after

 2     that?

 3            A.    I have never seen the vessel since.

 4            Q.    Have you gone down to the Palm Bay Club

 5     since that day, to see what had happened to the

 6     vessel?

 7            A.    I went down to the Palm Bay-- on

 8     temporary occurrences-- where at the same time, my

 9     mother became very ill in Chicago, she was diagnosed

10     with a fatal brain tumor, and she ended up passing

11     away in October.

12                  I had gone to the Palm Bay Club

13     somewhere between that time, to see if the vessel

14     was there. It wasn't.

15                  I tried to place calls to Doctor Ingram.

16     I tried to place calls with Sea Tow, and I never

17     heard from either.

18            Q.    From June of 2002 through the next, two

19     three, months, had you heard anything from Doctor

20     Ingram as to what had happened to the boat?

21            A.    I spoke to him about three, four weeks

22     later. He said everything was taken care of.

23            Q.    Specifically, did he tell you what the

24     events were that day, who came, what happened?

25            A.    No.
```

1      Q.   He said he had spoken to Sea Tow, so you
2   tried to call Sea Tow?

3      A.   Yes.

4      Q.   How do you know Sea Tow was involved?

5      A.   Because Sea Tow when I had spoken to him
6   two hours later that day, and I asked what's going
7   on, he said Sea Tow was on the way to take care of
8   it.

9      Q.   You said you tried to call Sea Tow.

10         Do you recall which Sea Tow franchise
11   you called or how you got their number?

12      A.   The person who-- from-- the person who
13   came from Sea Tow-- I called back again Doctor
14   Ingram that night, and he had given me the name of
15   Sea Tow. He gave me the name of the person who was
16   out there and given me their phone number.

17      Q.   Do you recall which Sea Tow franchise or
18   who that person was?

19      A.   No. I passed that information to my
20   attorney.

21      Q.   Did you ever speak to anyone from Sea
22   Tow, as to what happened to the boat that day?

23      A.   No.

24      Q.   When you would call Sea Tow, what would
25   happen?

1          A.    No response.

2          Q.    When you say no response, you get a

3   recording or just couldn't--

4          A.    A recording for a while, and after that,

5   nobody picked up the phone, no recording.

6          Q.    You said after several months, you had

7   spoken to Doctor Ingram.

8                Did you ever speak to Doctor Ingram

9   again about what happened on the boat that day?

10         A.    No.

11         Q.    Did Doctor Ingram offer to make any

12  financial restitution for this?

13         A.    He said he would take whatever

14  responsibility for whatever it was to bring the boat

15  up and bring it back to the safe harbor.

16         Q.    From the date of the loss to today, has

17  he made any offers to pay for any of the loss you

18  suffered on this boat?

19         A.    No.

20         Q.    Have you presented him with any bills--

21         A.    I never got a bill.

22         Q.    Did you say, how about paying--

23         A.    I didn't get a chance to talk to Doctor

24  Ingram, period.

25                Doctor Ingram, developed some

1  professional problems. I don't recall exactly what

2  month it was, where he had a fatality during

3  surgery. He since exited the State of Florida. His

4  license has been suspended in the State of Florida.

5  He headed for parts unknown.

6      Q.   Based on that, he's obviously not living

7  at the Palm Bay Club anymore?

8      A.   No.

9      Q.   When was the last time you saw or spoke

10  to him?

11      A.   I can't recollect exactly.

12      Q.   At what point or at any point in time,

13  did you learn that Sea Tow had the boat or had taken

14  the boat?

15      A.   After my mother had passed away, family

16  matters, you know, settled down a little bit, I sat

17  down and kind of regrouped and said, what things do

18  I need to take care of, along with finding my boat,

19  you know, issues about the estate, etcetera,

20  etcetera, and I then had come to my attorney to help

21  me make inquiries.

22      Q.   What inquiries did you make or did your

23  attorney make in order to try to find the boat?

24      A.   Tried to get in touch with Sea Tow, ask

25  for specifics, asked for a bill, ask if we could

1    make restitution and get my boat back.

2         Q.   What did you or your attorney-- what did

3    you learn from Sea Tow, if anything?

4         A.   What I learned was through my attorney,

5    that basically-- I'm not sure that my attorney even

6    got any information at all. I don't think there was

7    any dialogue that went back and forth.

8         Q.   At any time did someone from Sea Tow

9    tell you that they actually had the boat?

10        A.   No.

11        Q.   At any time, did they tell you they

12   don't know where the boat is?

13        A.   They didn't tell me. I'm not sure what

14   they told my attorney.

15        Q.   Well, we can discuss that later, but as

16   far as you know, during the fall of 2002--

17        A.   No one would speak to me.

18        Q.   No one would talk to you and tell you

19   whether they had the boat or not?

20        A.   No one from Sea Tow spoke with me. I

21   never received a bill. I never received anything. I

22   never received any notification of possession. I

23   never received any communication whatsoever.

24        Q.   Did you or your attorney go to any other

25   agencies, such as the Florida Marine Patrol or the

```
 1    Fish and Game Commission, the Miami Beach Police,

 2    Miami-Dade Police, to make inquiries about a

 3    possible missing or stolen boat?

 4         A.   I haven't. I am not sure exactly who Mr.

 5    Pesetsky contacted.

 6         Q.   As far as you know, there hasn't been

 7    any police report filed?

 8         A.   Mr. Pesetsky, when I came here,

 9    recommended I go to the police and make a police

10    report. I went to a Miami substation around 5th and

11    Biscayne Boulevard. I made it on a Saturday

12    afternoon, and have been trying desperately to get a

13    copy of that.

14         Q.   Was that City of Miami or Miami-Dade?

15         A.   City of Miami.

16         Q.   Approximately what was that date, sir?

17         A.   Maybe 60 days ago.

18         Q.   This would make it about May or June--

19         A.   May-- April or May, June, something of

20    that nature.

21         Q.   Other than 60 days ago when you went to

22    the City of Miami Police substation to make a police

23    report, before that time, had you made any other

24    reports to any law enforcement agency regarding the

25    missing vessel?
```

```
 1          A.    No.
 2          Q.    Did you make any inquiries to any other
 3   persons, besides calling Sea Tow?
 4          A.    I tried to get--
 5          Q.    Some surveyors, mechanics?
 6          A.    No.
 7          Q.    Anyone?
 8          A.    No.
 9          Q.    The Miami Herald, nothing?
10          A.    Nobody.
11          Q.    When did you first notify someone from
12   the insurance company, from American Yachts, about
13   this loss?
14          A.    Mr. Pesetsky handled that for me.
15          Q.    Did you ever make any-- I have a letter
16   from Mr. Pesetsky in January of 2003, addressed to
17   an insurance company.
18                As far as you know, was that the first
19   time someone made an inquiry or report on your
20   behalf to the insurance company?
21          A.    Yes.
22          Q.    At the time it was recorded that the
23   boat was missing or presumed lost, had you already
24   lost touch with Doctor Ingram, or had he already
25   left by then, by January of this year?
```

```
 1          A.    I would assume.

 2          Q.    Let me put it another way.

 3                Have you ever heard from Doctor Ingram,

 4    or tried to reach him, after January of this year?

 5          A.    Yes.

 6          Q.    When was the last time you spoke to him?

 7          A.    I spoke to him over the phone a few

 8    weeks ago, regarding he had called me regarding his

 9    health.

10          Q.    Did he tell you where he was, or is--

11          A.    I did not ask.

12          Q.    And it was strictly a professional--

13          A.    That's right.

14          Q.    Medical call, as opposed--

15          A.    That's correct.

16          Q.    As opposed to a call about the vessel?

17          A.    Correct. There was no dialogue at all.

18                I had no answer.

19          Q.    After the report which was made to the

20    insurance company in January of this year, at what

21    point did you find or were you able to locate where

22    the boat had been taken to?

23          A.    My mechanic had been doing some work up

24    and down the Miami River, and he found my boat.

25                He called me in my office, and he said,
```

```
 1    Barry, where is your boat. I said I have no idea. He
 2    said, well I just found it.
 3          Q.    Okay. Had you spoken to your mechanic
 4    and asked him to look for the boat?
 5          A.    No.
 6          Q.    He just--
 7          A.    He had had an illness. He has cancer. He
 8    was not working for quite some time.
 9          Q.    And at any time since the boat had gone
10    missing, have you discussed this with the mechanic
11    and asked him to see if he could find it or offer a
12    reward, or anything like that?
13          A.    No.
14          Q.    Had you had any discussion with him or
15    anyone else, besides Doctor Ingram and your attorney
16    and Sea Tow, about the fact that the boat was
17    missing?
18          A.    No.
19          Q.    And he just happened to see your boat on
20    the river, and said, hey, what's the matter with
21    your boat, something along those lines?
22          A.    Yes.
23          Q.    What did he tell you about the boat when
24    he called you?
25          A.    Kind of asked me, what the hell was it
```

21

```
 1    doing there, and I said, thank God, I thank God you
 2    found it, and then I told him that I had lost the
 3    boat.
 4          Q.   After he saw the boat, did you offer him
 5    any kind of reward or tell him there was any kind of
 6    reward for the boat?
 7          A.   No. He's-- he's a gentleman with a
 8    strong personality. He said that in cases like this,
 9    they usually provide a finder's fee, to make sure
10    you tell your attorneys that I want a finder's fee.
11    That's what he told me.
12          Q.   Before Marvin had told you about the
13    boat, do you know of anyone who had put out any kind
14    of word that the boat was missing?
15          A.   No.
16          Q.   You certainly did not?
17          A.   No.
18          Q.   And as far as you know, the police have
19    not or the Coast Guard, Marine Patrol--
20          A.   No. And under oath, I didn't even tell
21    my wife. How am I going to explain this to her?
22          MR. KARCHER: Off the record.
23          (Off the record discussion.)
24    BY MR. KARCHER:
25          Q.   While we were off the record, your
```

```
 1    attorney pointed out that on July 3, 2003, your

 2    attorney, Mr. Pesetsky, had notified the insurance

 3    company that the boat had been found at the Agra

 4    Boat Yard or Agra Yacht Service yard on the Miami

 5    River.

 6         A.   Yes.

 7         Q.   At any time since then, have you spoken

 8    with the managers of Agra Boat Yard?

 9         A.   I spoke with him once or twice.

10         Q.   Approximately when was that?

11         A.   The same day the boat was found, and

12    maybe a day after that or so.

13         Q.   And was that Jose Agra?

14         A.   I guess.

15         Q.   What did the person from Agra Boat Yard

16    tell you about this vessel?

17         A.   He told me that was one of several

18    vessels that Sea Tow has dumped there for a good

19    long time, and he mentioned some figures. I don't

20    know whether he was talking about my figures, all

21    the boats, some numbers to the tune of 30, $40,000.

22              And I asked him please do not release

23    the boat, because we found it, you know, so--

24         Q.   Did Mr. Agra tell you that or say

25    anything about that he had tried to find you or the
```

1    owner of this vessel at any time?

2          A.    No.

3          Q.    I have not seen your boat.

4                Is the name of the vessel painted on the

5    transom of the boat?

6          A.    It's stenciled on the back of the boat.

7          Q.    In large letters?

8          A.    Very large letters. I believe it's a

9    peel on stencil, and the letters I would say are

10   about at least a foot to a foot and-a-half large.

11         Q.    You said it was a U.S. documented

12   vessel?

13         A.    Yes.

14         Q.    Does it have Florida registration

15   numbers on the side of the boat?

16         A.    It did. To my recollection-- no, it did

17   not have Florida registration numbers on the boat,

18   because the boat was docked-- it did have for the

19   time it had a current Florida sticker on the side.

20         Q.    Do you know if the documentation was

21   current?

22         A.    Yes.

23         Q.    And you're still getting the--

24         A.    Yes.

25         Q.    Let me finish the question.

```
 1              You're still getting the letters from
 2    the U.S. Coast Guard once a year?
 3         A.   Yes.
 4         Q.   Did Mr. Agra say one way or the other,
 5    whether he had taken any steps to locate the owner
 6    of this vessel?
 7         A.   Not to my recollection.
 8         Q.   He didn't say to you, I'm glad you're
 9    here, I'm glad I could find you to--
10         A.   No.
11         Q.   Did he present you with a bill at any
12    time?
13         A.   No.
14         Q.   Did you give him an address, phone--
15         A.   I gave him my phone number and the
16    number of my attorney.
17              MR. PESETSKY: Off the record.
18    BY MR. KARCHER:
19         Q.   I understand since that time, your
20    attorney told me, that he had sent you a bill or
21    someone sent you a bill for Agra Boat Yard.
22              Besides the bill from Agra Boat Yard,
23    have you received any other bills for services
24    rendered to the vessel?
25         A.   An estimate of repairs was sent to my
```

1    attorney.

2         Q.    Okay. And was that from your mechanic,

3    from Marvin?

4         A.    Yes.

5         Q.    We'll get copies of that later, but do

6    you recall how much it was?

7         A.    In the neighborhood of somewhere between

8    40 to $45,000.

9         Q.    Have you been down to look at the boat

10   since it was in the boat yard?

11        A.    No, I have not.

12        Q.    Did you look over the estimate which

13   Marvin gave to you?

14        A.    Briefly, but I did not go line by line.

15        Q.    Did you have a generator on the boat?

16        A.    Yes.

17        Q.    Do you know if it was still on the boat

18   or--

19        A.    I believe the generator is still listed

20   in that estimate.

21        Q.    When you say listed in that estimate,

22   meaning listed to be replaced?

23        A.    Replaced.

24        Q.    Repaired?

25        A.    Replaced.

1          Q.   Do you know if the generator was taken

2    off the boat by anybody?

3          A.   My generator-- when the major repair was

4    done, the generator had come off the boat to go for

5    repair.

6          Q.   When you say the major repair, which one

7    was that?

8          A.   When Mr. Warhaftig had repaired my boat

9    prior to going to the Palm Bay Club.

10         Q.   So that would have been some period of

11   months before the boat was lost?

12         A.   That's correct.

13         Q.   Do you recall that the generator had

14   ever been put back on the boat?

15         A.   I don't know. Mr. Warhaftig took it to

16   the Palm Bay Club.

17         Q.   It's my understanding that the generator

18   is no longer on the boat, at least from one of the

19   estimates that I saw, either from-- I don't think it

20   was from Marvin, but Brett Carlson, a surveyor--

21              MR. PESETSKY: I didn't see Brett

22   Carlson's, but I got Marvin's.

23              MR. KARCHER: At least someone to try to

24   take a look at it and see the shape of the boat,

25   in-- I believe I had seen somewhere, a generator was

```
1    not on the boat, and was trying find out if it had
2    been there before the loss.
3              If a Sea Tow--
4              THE WITNESS: There was a generator on my
5    boat. I didn't need to see the repair or-- I have
6    never seen the generator, since the-- because of
7    being a busy physician, since it was taken back.
8    BY MR. KARCHER:
9         Q.    So when it was sent to be repaired,
10   Marvin handled it?
11        A.    Yes.
12        Q.    Took it off?
13        A.    Yes. One of the engines had come out.
14   Generator had come out. I had paid somewhere near 25
15   to $30,000 in repairs for that boat approximately
16   six months prior to loss.
17        Q.    Who were those payments made to?
18        A.    Mr. Warhaftig.
19        Q.    Did all the payments for service of the
20   vessel, go through him?
21        A.    Yes.
22        Q.    If he had to farm out work to somebody
23   else, would he take care of it, included in his
24   bills?
25        A.    Yes.
```

28

1    Q.   Other than the bills which you are-- or

2   actually your attorney received from Agra Boat Yard,

3   did you or have you received anything from Sea Tow

4   regarding this vessel?

5    A.   Nothing.

6    Q.   Or has anyone from Sea Tow called you to

7   tell you that they have a lien on the vessel for

8   some amount of money?

9    A.   No.

10    Q.   I have a copy of bills I received from

11   Agra Yacht Service, which may be the same one, and

12   we can compare them later, but it is listed as being

13   billed to Captain John Telum, Sea Tow, Biscayne Bay.

14    Have you ever spoken to John Telum, to

15   the best of your knowledge?

16    A.   I have spoken to one person at Sea Tow,

17   and I don't remember who I spoke to.

18    Q.   At any point since last summer, or since

19   the incident, did you ask, authorize or request

20   anyone from Sea Tow to tow your boat to Agra Yacht

21   Service?

22    A.   No.

23    Q.   Did it come as a surprise to you, that's

24   where the boat had been taken?

25    A.   Yes.

```
 1          Q.   I have received a copy of an Agra Yacht

 2     Service owner's agreement, with-- dated August 1,

 3     2002. This is part of the same bills which have John

 4     Telum of Sea Tow, as the person to bill to.

 5               I'll show it to you and your attorney,

 6     but--

 7               MR. PESETSKY: I have got the same bill.

 8     It's--

 9               MR. KARCHER: We can compare them.

10     BY MR. KARCHER:

11          Q.   Let me show you that, and where it says

12     owner or managing agent, is that your signature or

13     not your signature?

14          A.   It is not mine.

15               MR. PESETSKY: I never saw that.

16               MR. KARCHER: Off the record.

17               (Off the record discussion.)

18     BY MR. KARCHER:

19          Q.   I'll make copies of this for you. This

20     is-- I have a bill I received from Agra Boat Yard,

21     and I can-- we'll make copies for your attorney.

22               I contacted someone from there, and they

23     have an attorney who sent me copies of their bills,

24     and the last page is an Agra Yacht Service/owner

25     agreement, where it says owner, managing agent, and
```

1    it's-- and the signature block, but it was also

2    billed to John Telum of Sea Tow.

3              Other than the estimate which you

4    received from Marvin for repairs to the vessel, has

5    anyone else been sent by you or on your behalf, to

6    go look at the boat or form an estimate for repairs?

7         A.   No.

8         Q.   Have you or anyone on your behalf, begun

9    any repairs on the vessel or anything to preserve

10   this boat?

11        A.   No.

12        Q.   Clean it or anything?

13        A.   No.

14        Q.   As far as you know, it's still at Agra

15   Boat Yard, sitting there, and it's out of the water?

16        A.   Yes.

17        Q.   To the best of your knowledge from what

18   they have told you, it's been out of the water since

19   August of 2002?

20        A.   Yes.

21        Q.   Other than the questions we've asked a

22   little bit about the generator, do you know of any

23   equipment which was either on the boat before the

24   loss or has been missing since then?

25        A.   No.

1      Q.    As far as you know, you don't know if

2   there's any equipment missing?

3      A.    I don't know if there's any equipment

4   missing.

5      Q.    Did you go through or have you gone

6   through any inventory of things on the boat--

7      A.    No. I would like--

8      Q.    Let me finish.

9            From Marvin, the mechanic?

10     A.    No.

11           I would like to qualify some things.

12   Maybe it will help you.

13           Three years ago I was in an accident and

14   I lost the sight in this eye, and I have a plate and

15   eight screws in here.

16           I had removed most of the personal

17   belongings from the boat, because I had intentions

18   of putting the boat up for sale. I had the boat up

19   for sale. It comes back to me now. I'm trying to

20   remember what I did with my boat.

21           By the time I sold my home in Keystone,

22   I had put the boat up for sale. My attorney is not

23   aware of it, at Reel Deal Yachts, and it did not

24   sell.

25           Then that's when I moved it to the Palm

1   Bay Club. I did not feel qualified to move the boat,

2   myself, or even get on the boat, with my one eye

3   again. It's taken me a while to adjust to being

4   single sighted. That's why I didn't even get behind

5   the wheel of the boat.

6        Q.   Okay. In the past few years, have you

7   had any surveys done on the vessel, either for

8   insurance purposes, sale purposes, or any other

9   reason?

10       A.   I don't recollect.

11       Q.   Since the boat was bought new in '94, do

12  you know if there were-- do you know if there were

13  any surveys that were done on the boat for insurance

14  purposes?

15       A.   I don't recollect.

16       Q.   When the boat was put up for sale with

17  Reel Deal Yachts, was there any type of equipment

18  list that was-- of things that were on the boat?

19       A.   I'm sure there was a list, and it was

20  pretty much all standard.

21       Q.   Would you have a copy somewhere of the

22  listing of the vessel that might have the equipment

23  that was on the boat?

24       A.   I may.

25       Q.   Other than Marvin, who went on the boat

33

 1   to do an estimate of it, do you know of anyone else

 2   who has gone on your behalf to either look at or

 3   inspect it or--

 4        A.   No. I have notified no one else.

 5        Q.   Other than your conversations with Jose

 6   Agra of Agra Yacht Service, have you spoken to

 7   anyone else from there regarding the boat?

 8        A.   No.

 9        Q.   Has anyone called and said they are

10   going to put a lien on the vessel or seize the

11   vessel for sale purposes?

12        A.   No.

13        Q.   To pay for the loss?

14        A.   No.

15        Q.   Do you know if anyone has called your

16   attorney, saying that they are looking to seize the

17   boat?

18        A.   He has not informed me of same.

19        Q.   Have you spoken to anyone in the last

20   month or so from Sea Tow or a representative,

21   regarding a lien on the vessel?

22        A.   No.

23        Q.   And have you received any-- at any time,

24   received any written letter, notice, lien, or any

25   other type of papers from Sea Tow, regarding the

1    loss of the boat and the lien for their services?

2           A.   No.

3           Q.   You told me that Doctor Ingram was

4    running the boat and he-- I'm repeating this. I

5    apologize.

6                To the best of you knowledge, that's the

7    only time that you know of that Doctor Ingram has

8    run the boat?

9           A.   Yes.

10          Q.   Before that, how often did you go down

11   to look at it, inspect it, to see how it was doing?

12          A.   Probably once every month, three weeks,

13   after a bad storm, I would drop by.

14          Q.   Did you ever notice that the lines had

15   been tied different or there was anything different

16   on the inside?

17          A.   No.

18          Q.   As far as you knew, it looked the same?

19          A.   Yes.

20               Again, I didn't board the boat when I

21   went to check it, because of the loss of my

22   eyesight. It was a difficult thing for me to do.

23               MR. KARCHER: Sir, when we're done, I

24   want to go through with your attorney, and see if

25   there's some of the bills you have, or that-- sent

1    from Marvin, and if you could, sometime in the

2    future, see if you have a copy of that listing that

3    may have an equipment list as to what was on the

4    boat, so we can use that to compare to what is on

5    the boat now.

6                I don't have any more questions for you.

7    Thank you for your time.

8                (Thereupon the Examination

9                Under Oath was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

36

```
1                    CERTIFICATE OF REPORTER

2

3      STATE OF FLORIDA

4

5      COUNTY OF DADE

6

7

8           I, Stan Seplin, Certified Shorthand Reporter,

9      certify that I was authorized to and did

10     stenographically report the Examination Under Oath,

11     of Barry Blumenthal, M.D., and that the transcript

12     is a true and complete record of my stenographic

13     notes.

14           I further certify that I am not a

15     relative, employee, attorney or counsel of any of

16     the parties, nor am I a relative or employee of any

17     of the parties' attorney or counsel connected with

18     the action, nor am I financially interested in the

19     action.

20

21           DATED this 17th day of October, 2003.

22

23

24           Stan Seplin,

25           Certified Shorthand Reporter
```

STANLEY SEPLIN
MY COMMISSION # DD 074125
EXPIRES: December 25, 2005
Bonded Thru Budget Notary Services

SEPLIN REPORTING, INC.
Phone (305) 279-5894 Fax (305) 279-4046

LAW OFFICES

# PESETSKY & ZACK P.A.

WALTER S. PESETSKY
ELLIOTT NOEL ZACK

January 7, 2003

17701 BISCAYNE BOULEVARD,
SUITE 200
AVENTURA, FLORIDA 33160
TELEPHONE: (305)682-7878
FAX: (305)937-2654

### VIA FACSIMILE AND U.S. MAIL (561)395-4239

C & L INSURANCE, INC.
7301 W. Palmetto Park Road, Suite 101C
Boca Raton, Florida 33433

Attention: Mike Costolo, President

Re:     Yacht Policy
        AYL5020334
        1994 40' Mainsh p

Dear Mr. Costolo:

The undersigned represents Dr. Barry Blumenthal regarding the above captioned matter.

Under yacht policy AYL5020334, Dr. Blumenthal's yacht is missing and presumed lost.   We have been endeavoring to find said yacht, but have been unsuccessful.

In accordance with the above captioned policy we are hereby making claim for the loss of Dr. Blumenthal's yacht.

Please direct all future telephone contact or correspondence to the undersigned and not to Dr. Blumenthal.

Very truly yours,

PESETSKY & ZACK, P.A.

Walter S. Pesetsky
WSP/glk

EXHIBIT
3

RECEIVED

LAW OFFICES
# PESETSKY & ZACK P.A.

WALTER S. PESETSKY
ELLIOTT NOEL ZACK

17701 BISCAYNE BOULEVARD,
SUITE 200
AVENTURA, FLORIDA 33160
TELEPHONE: (305)682-7878
FAX: (305)937-2654

February 11, 2003

**<u>VIA FACSIMILE (703)461-4669 and U.S. Mail</u>**

American Yachts, Ltd.
P. O. Box 22657
Alexandria, VA 22304

Attention:     Richard C. Wilson, Claims Manager
               Marine Insurance Claims

Dear Mr. Wilson:

In response to your facsimile dated January 11, 2003 requesting additional information, be advised of the following:

| | | | |
|---|---|---|---|
| 1. | Date of Loss | - | Sunday, July 14, 2002 between 5:30 p.m. and 6:00 p.m. |
| 2. | Loss Location | | South Side of Rickenbacker Causeway, ran aground on sand bar and called Sea Tow |
| 3. | Police Report | - | None |
| 4. | Boat last seen and by whom | - | July 14, 2002 - Dr. Alton Ingram and Lisa Glode |

I trust this is the information you requested.

Very truly yours,

PESETSKY & ZACK, P.A.

Walter S. Pesetsky
WSP/glk

EXHIBIT
4

LAW OFFICES
## PESETSKY & ZACK  P.A.

WALTER S. PESETSKY
ELLIOTT NOEL ZACK

17701 BISCAYNE BOULEVARD,
SUITE 200
AVENTURA, FLORIDA 33160
TELEPHONE: (305)682-7878
FAX: (305)937-2654

July 3, 2003

## VIA FACSIMILE (904)384-5334 and U.S. Mail

American Yachts, Ltd.
3326 Lake Shore Blvd., Suite 5
Jacksonville, FL 32210

Attention:     Connie Darner, Claims Supervisor

Re:     The Continental Insurance Company
        Policy No. AYL5020334-06
        Claim No. AYL 20030031
        Date of Loss:  June 29, 2002
        Your Insured:  Dr. Barry Blumenthal

Dear Ms. Darner:

It was nice speaking with you yesterday together with Paul Ansel and again today.

I have learned the following regarding the above captioned matter.  The boat is presently stored at Agra Yacht Service, Inc., 2617 N.W. 16th Street Road, Miami, Florida 33125.  The owner of the marina is Jose Agra and his telephone number is (305)635-6945.

We are very lucky that a mechanic who had previously worked on this boat recognized it and called my client, Dr. Barry Blumenthal.

As I had notified you previously, I had tried on five or more occasions to call Sea Tow and inquire as to their bill in reference to the salvage of the boat.

I have been assured by Jose Agra, that the boat will not be released to anyone until we have an opportunity to all be in touch.

I have engaged the mechanic who found the boat, Marvin Corum, to give me an estimate of the condition of the boat.  He informed me that the boat is not in the water and therefore, his

_____ assessment shall be conditional.

I will be on vacation from July 4th through July 8th, but if it is necessary to reach me you may do so by calling my cellular phone (305)450-8546.

Very truly yours,

PESETSKY & ZACK, P.A.

Walter S. Pesetsky
WSP/glk

Michael Kachn
305-661-5888

CORVAIR HAVEN MARINE     305-+9329400          P.02

# CORVAIR HAVEN MARINE SERVICE
**5835 SW 25 STREET**
**HOLLYWOOD, FL 33023**
**(305)653-0641 DADE (954)981-0239 BROWARD**
**(305)932-9400 FAX**
**SERVING SOUTH FLORIDA AND THE CARIBBEAN SINCE 1965**

July 16, 2003

Dr. Barry Blumenthal
671 Island Rd.
Miami, Fl 33137

Estimate of repairs to 40 ft. Mainship "BLU ACE III" Doc.# 1027582
Continental Ins. Co. Policy # AYL5020334-06
Claim # AYL20030031

Vessel found in marina on Miami river by Marvin D. Warhaftig, owner
of Corvair Haven Marine. Vessel was recognized as to the fact that
I used to work on it and I happened to seethe boat sitting in storage.

| | | |
|---|---|---:|
| Replace entire Bridge enclosure with canvas and plastic panels. | | $8,250.00 |
| " | all Bridge cushions incl. new foam and framing. | 3,765.00 |
| " | all aft cushions (cockpit) | 2,200.00 |
| " | all cabin carpet. (Stained and mildew) | 1,800.00 |
| " | all Hatch covers | 375.00 |
| Major cleaning and waxing of entire vessel. (Inside and out) | | 850.00 |
| Pump out old rotten gas from tanks and flush tanks. | | |
| Dispose of old gas. | | 1,200.00 |
| Replace missing generator with 7.3 K.W. Kohler system. | | 6,326.43 |
| Generator muffler and hoses | | 245.00 |
| 2 Engine and 1 generator batteries. | | 265.00 |
| 1 1 Cabin door lock assembly. | | 149.00 |
| Assorted clamps and hardware. | | 100.00 |
| Paint bottom with anti fouling paint. Paint oxidized and powdered from time out of water. | | 880.00 |


EXHIBIT
6

# CORVAIR HAVEN MARINE SERVICE

5835 SW 25 STREET
HOLLYWOOD, FL 33023
(305)653-0641 DADE (954)981-0239 BROWARD
(305)932-9400 FAX
SERVING SOUTH FLORIDA AND THE CARIBBEAN SINCE 1965

Page 2

| | | |
|---|---|---|
| Paint all lower hardware | | $  450.00 |
| Spark plugs, oil, filters, etc. | | 144.00 |
| Labor to install and repair all listed items. | 10 hrs. | 600.00 |
| Float and run up engines. Run to owners dock. | 6 hrs. | 360.00 |
| | | |
| Total for all parts and labor listed. | | $27,959.49 |
| Fl. sales tax @ 7% | | 1,957.13 |
| Total | | $29,916.62 |

Vessel found by Marvin D Warhaftig, owner of Corvair Haven Marine.
Finders fee for recovery of vessel, 10% of insured value.
Insured value. $140,000.                                $14,000.00

Total of all items.                                     $43,916.00

Marvin D. Warhaftig.
Corvair Haven Marine



**AGRA YACHT SERVICE**
2617 NW 16 STREET ROAD
MIAMI, FL 33125
PH 305 635 6945   FX 305 633 3013

**STATEMENT**

| DATE |
|------|
| 7/1/2003 |

TO:

CAPTAIN JHON TELLAM
SEA TOW BISCAYNE BAY
P.O. BOX 490162
KEY BISCAYNE, FL 33149

| DATE | TRANSACTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 08/31/2002 | Balance forward | | 0.00 |
| | BLUE ACE III- | | |
| 12/09/2002 | INV #1700 | 10,152.01 | 10,152.01 |
| 07/01/2003 | INV #1864 | 18,527.10 | 28,679.11 |

EXHIBIT
7

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | AMOUNT DUE |
|---------|--------------------|--------------------|--------------------|----------------------|------------|
| 18,527.10 | 0.00 | 0.00 | 0.00 | 10,152.01 | $28,679.11 |



**AGRA YACHT SERVICE**
2617 NW 16 STREET ROAD
MIAMI, FL 33125
PH 305 635 6945  FX 305 633 3013

**INVOICE**

| DATE | INVOICE # |
|---|---|
| 7/1/2003 | 1864 |

BILL TO :

CAPTAIN JHON TELLAM
SEA TOW BISCAYNE BAY
P.O. BOX 490162
KEY BISCAYNE, FL 33149

| YACHT NAME | TYPE/MAKE | TRANSOM Nº | LOA | TERMS | P.O. Nº. |
|---|---|---|---|---|---|
| BLUE ACE III | MAINSHIP | MPC40224K394 | 40 Se... | Due on receipt | 080102-1700 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| JANUARY/2003 LAY DAYS WET OR DRY $ 2.00 PER FOOT LENGTH OVERALL PER DAY 84 + | 31 | 80.00 | 2,480.00T |
| FEBRUARY/2003 LAY DAYS WET OR DRY $ 2.00 PER FOOT LENGTH OVERALL PER DAY 84 + | 28 | 80.00 | 2,240.00T |
| MARCH/2003 LAY DAYS WET OR DRY $ 2.00 PER FOOT LENGTH OVERALL PER DAY 84 + | 31 | 80.00 | 2,480.00T |
| APRIL/2003 LAY DAYS WET OR DRY $ 2.00 PER FOOT LENGTH OVERALL PER DAY 84 + | 30 | 80:00 | 2,400.00T |
| MAY/2003 LAY DAYS WET OR DRY $ 2.00 PER FOOT LENGTH OVERALL PER DAY 84 + | 31 | 80.00 | 2,480.00T |
| JUN/2003 LAY DAYS WET OR DRY $ 2.00 PER FOOT LENGTH OVERALL PER DAY 84 + | 30 | 80.00 | 2,400.00T |
| JULY/2003 LAY DAYS WET OR DRY $ 2.00 PER FOOT LENGTH OVERALL PER DAY 84 + | 31 | 80.00 | 2,480.00T |
| SUBTOTAL | | | 16,960.00 |
| LIABILITY INSURANCE FEE | | 2.24% | 379.90 |

We appreciate your prompt payment.

All goods remain the property of the seller until paid for in full. 1.5 % per Month service charge ( 18 % anual percentage rate ) will be added to accounts 30 days past due. After 3 Month of unsuccessfull collection, seller will lien the subject vessel to grant the unpaid balance due on work, parts and daily charge for storage on the vessel.

| | |
|---|---|
| Subtotal | $17,339.90 |
| Sales Tax (7.0%) | $1,187.20 |
| Total | $18,527.10 |
| Payments/Credits | $0.00 |
| Balance Due | $18,527.10 |

| E-mail | Web Site |
|---|---|
| AGRAYACHT@BELLSOUTH.NET | WWW.AGRAYACHT.COM |



**AGRA YACHT SERVICE**
2617 NW 16 STREET ROAD
MIAMI, FL 33125
PH 305 635 6945   FX 305 633 3013

**INVOICE**

| DATE | INVOICE # |
|---|---|
| 12/9/2002 | 1700 |

BILL TO :

CAPTAIN JHON TELLAM
SEA TOW BISCAYNE BAY
P.O. BOX 490162
KEY BISCAYNE, FL 33149

| YACHT NAME | TYPE/MAKE | TRANSOM Nº | LOA | TERMS | P.O. Nº. |
|---|---|---|---|---|---|
| BLUE ACE III | MAINSHIP | MPC40224K394 | 40 Se... | Due on receipt | 080102-1700 |

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| HAULING ( OUT ), PER FOOT LENGTH OVERALL (PULPIT TO PLATFORM) | 40 | 3.50 | 140.00T |
| SECURE VESSEL ON LAND | | 45.00 | 45.00 |
| LAUNCHING ( IN ) PER FOOT LENGTH OVERALL PULPIT TO PLATFORM | 40 | 3.50 | 140.00T |
| LAY DAYS WET OR DRY $ 0.75 PER FOOT LENGTH OVERALL PER DAY 1 - 28     FROM 08/01/02  TO  08/31/02 | 31 | 30.00 | 930.00T |
| LAY DAYS WET OR DRY $ 1.00 PER FOOT LENGTH OVERALL PER DAY 29 - 56     FROM 09/01/02  TO  09/30/02 | 30 | 40.00 | 1,200.00T |
| LAY DAYS WET OR DRY $ 1.50 PER FOOT LENGTH OVERALL PER DAY 57 - 84     FROM 10/01/02  TO  10/31/02 | 31 | 60.00 | 1,860.00T |
| LAY DAYS WET OR DRY $ 2.00 PER FOOT LENGTH OVERALL PER DAY 84 +     FROM 11/01/02  TO  11/31/02 | 30 | 80.00 | 2,400.00T |
| LAY DAYS WET OR DRY $ 2.00 PER FOOT LENGTH OVERALL PER DAY 84 +     FROM 12/01/02  TO  12/31/02 | 31 | 80.00 | 2,480.00T |
| ENVIRONMENTAL FEE ANY VESSEL ( COVER DISPOSAL AND CLEANING ALL POLLUTANTS MATERIALS ) | | 150.00 | 150.00 |
| SUBTOTAL | | | 9,345.00 |
| LIABILITY INSURANCE FEE | | 2.24% | 209.33 |

We appreciate your prompt payment.

All goods remain the property of the seller until paid for in full.  1.5 % per Month service charge ( 18 % anual percentage rate ) will be added to accounts 30 days past due. After 3 Month of unsuccessfull collection, seller will lien the subject vessel to grant the unpaid balance due on work, parts and daily charge for storage on the vessel.

| E-mail | Web Site |
|---|---|
| *AGRAYACHT@BELLSOUTH.NET* | *WWW.AGRAYACHT.COM* |

| | |
|---|---|
| Subtotal | $9,554.33 |
| Sales Tax (6.5%) | $597.68 |
| Total | $10,152.01 |
| Payments/Credits | $0.00 |
| Balance Due | $10,152.01 |

Sea Town   R. Biscayne   30√   361 - 9500
Fax 30√   969 1485   Robin

# AGRA YACHT SERVICE
**"Your Full Service Boat Yard"**
2617 NW 16th Street Rd. Miami, FL 33125
Tel: 305 635-6945       Fax: 305 633-3013

12:00 PM.

08/01/02
ORDER DATE

Boat Name: _Blue ACE III_

Owner Name:

Address:

City State Zip:

Hm. Phone:

Bus. Phone:

Captain's Name:

Captain's Phone:

Vessel Insurance Co.:

Policy No.:

Work Order No.: MIDSHIP.

Type/Make: 40 SEDAN BRIDGE

Loa:

Doc. No./Boat Reg. No.: MPL 40224K394

Transom No.:

Keys Received:

| | |
|---|---|
| Haul And Launch | |
| Blocking | |
| Clean Bottom  Heavy Barnacles | Pressure Cleaning |
| Clean, Wax Hull, Or Top Side (Or Both) | |
| Raise Boot Stripe (Water Line) | |
| Paint Boot Stripe (1 Or 2 Coats) | |
| Paint Hull And Top Side (Or Both) | |
| Running Gear (Shafts, Props, Rudders) | |
| Sand Blast, Pealing, Or Sanding Bottom | |
| Blisters Job | |
| Primer Bottom | |
| Paint Bottom (1 Or 2 Coats And Color) | |
| Engine | |
| Generator | |
| Refrigeration | |
| Air Conditioning | |
| Electric Work | |
| Lay Days | |
| Zincs  Shaft      Rudders      Trim Tabs      Transom | |
| Electricity 110 V      220 V Line | |
| Waste (Solid Or Solvent) Disposal | |
| Water | |
| Oil Waste Disposal | |
| Hurricane Shelter Dry            Wet | |
| Independent Contractors Fee | |
| Materials | |
| Others | Deposit |
| | Subtotal |
| | Tax |
| | Total |

All parts & labor payments are due and payable upon completion of the job stipulated in this invoice. All goods remain the property of Agra Yacht Service until paid for in full.  A 15% restocking charge on all returns.  All returns must be accompanied by this bill.  Purchaser/client agrees to pay delinquent service charges of 1.5% per month applied to unpaid balance, together with seller's collection costs including court costs and attorneys fees.  Purchaser/client grants the seller a lien on the subject vessel to the extent of the unpaid balance due on work performed by seller on the said vessel.

Authorized By Owner Or Representative _____

# AGRA YACHT SERVICE/OWNER AGREEMENT

## HAULING, LAUNCHING STORAGE, REPAIRS, FABRICATION, INSTALLATION AND MAINTENANCE AGREEMENT

1.     This Agreement is for hauling, launching, use of pier or storage space, repairs, fabrication, installation, and maintenance or other work requested by the Owner and agreed to be performed by Agra Yacht Service (hereinafter referred to as "Agra"). This Agreement incorporates all terms and conditions of the above Agreement and contains additional terms and conditions as follows:

2.     Agra agrees to repair, fabricate, make installation on and/or perform maintenance or other work on the vessel in a good and workmanlike manner pursuant to the terms as outlined, and the Owner and/or vessel agrees to pay Agra for said work, labor and materials as hereinafter stated.  In the event that specific prices are not quoted, it is understood and agreed that all work is to be performed at Agra's usual and customary time and material charge.  IT IS UNDERSTOOD AND AGREED THAT, OTHER THAN AS SPECIFICALLY SET FORTH HEREIN, AGRA MAKES NO WARRANTY EXPRESSED OR IMPLIED, WITH RESPECT TO AGRA'S WORKMANSHIP OR MATERIALS FURNISHED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR USE; NOR DOES AGRA ASSUME NOR DOES IT AUTHORIZE ANYONE ELSE TO ASSUME ON ITS BEHALF, ANY OBLIGATION OR LIABILITY IN CONNECTION WITH THE SALE OR INSTALLATION OF EQUIPMENT MADE OR MANUFACTURED BY AN ENTITY OTHER THAN AGRA; WITH RESPECT TO SUCH EQUIPMENT, THE WARRANTIES AGAINST DEFECT IN MATERIAL AND WORKMANSHIP BY THE BUILDER AND/OR MANUFACTURER OF SUCH EQUIPMENT, ARE THE SOLE WARRANTIES EXPRESSED AND/OR IMPLIED, PERTAINING TO THE SALE AND/OR INSTALLATION OF SUCH EQUIPMENT.

3.     'Agra's sole liability in the event of improper fabrication, installation of parts or equipment shall be that of the proper refabrication, reinstallation of said parts and equipment. In no event shall Agra be liable for consequential damages arising from defective materials or workmanship, improper installation of parts or equipment, or stemming from a breach of warranty, expressed or implied, with respect to equipment manufactures by others which is installed.

4.     It is understood that the vessel's Owners, Owners' employees, representatives, agents and all others acting on behalf of Owner have, at all times, access to the vessel and accordingly Agra does not have exclusive custody, care and control of the vessel and, or its contents while said vessel is on the premises of Agra for any purpose. Agra shall not be responsible for protection of/or loss or damage to the vessel due to fire, theft or any other cause beyond its control. Agra shall not be responsible for damage to, or loss of, any articles of personal property, gear or other appurtenances left aboard the vessel, due to any cause of any nature whatsoever. Outside contractors or paid workman are not permitted to work on boats except by permission of Agra. If permission is granted, liability insurance for the workmen must be provided and a Certificate of insurance, with Agra named as loss payee, is to be supplied by the outside contractor.

5.     The Owner agrees to make payments, including partial payments, for services, labor and materials supplied by Agra upon demand, including, but not limited to, a deposit as requested by Agra. Also, with respect to work in progress, the Owner agrees to pay all partial payments requested by Agra and Owner specifically agrees to make payment of at least 75% of completed work in progress, as and when requested by Agra. Furthermore, all services, labor and materials shall be paid in full prior to the vessel leaving the yard of Agra and Owner acknowledges and agrees that the vessel shall not be removed until all services, labor and materials are paid in full.  IT IS EXPRESSLY UNDERSTOOD AND OWNER AGREES THAT CHARGES AND FEES UNDER THIS AGREEMENT ARE DUE ON A WEEKLY BASIS AND THAT IF NON-PAYMENT OCCURS AND IF SAID NON-PAYMENT CONTINUES FOR THIRTY (30) DAYS, THEN THE VESSEL MAY BE DISPOSED OF BY AGRA IN ANY MANNER WHICH IS PERMISSIBLE UNDER THE LAWS OF FLORIDA AND THAT SAID MANNER OF DISPOSAL INCLUDES BUT IS NOT LIMITED TO A PUBLIC OR PRIVATE SALE BY AGRA FOR CHARGES. This provision is not in lieu of any state or federal maritime lien. Owner covenants and agrees that in the event any suit, is brought to collect any amounts due or to become due hereunder or enforce any appropriate maritime or other liens, Owner shall pay reasonable attorney's fees for such suit, court costs and any maritime fees, or other necessaries as set forth in Title 46, Section 31342 of The United States Code. In the event of any breach of this agreement by Owner, Agra shall be entitled to reasonable attorney's fees and all costs incurred in successful collection of any amounts due to Agra.

6.     As part of consideration for this Agreement the Owner, for himself, his heirs and assigns, hereby releases and agrees to release and save Agra harmless from liability and to fully indemnify from any and all liability for personal injury, loss of life, and property damage to the vessel, it's equipment, accessories or other personal property on or about the premises of Agra; whether the said boat is docked or hauled by an agent of Agra or not. Agra is not considered under this agreement, as an insurer of Owner's property, and it is suggested that Owner secure such insurance coverage against all boat and boating hazards and loss as he desires. Owner further agrees to waive all rights of subrogation against Agra.

7.     Agra its agents and employees, are authorized to move and/or operate Owner's vessel during the hauling, launching, painting, making of repairs, or when otherwise moving said boat for normal marine operation.

8.     Liability of Owner: The Owner agrees to protect, indemnify, and hold harmless Agra, its agents and employees from and against any and all claims, demands, damages, suits, losses, attorney fees, liability, awards, judgments and expenses of any nature for damage to property or for injury to any person or persons resulting from or in any way arising out of the negligent acts or omissions of the Owner or his agents while on the premises of Agra and Agra is hereby given a lien on the vessel for all such costs.

## LIENS AGAINST VESSEL

9.     Agra has a possessory lien in accordance with Florida Statute Section 713.60 for the performance labor or service of any kind on, to or for the use or benefit of a vessel, whether partially or completely constructed and whether launched or on land. Said lien shall attach to the vessel, its hull, equipment, her tackle, apparel and furniture.

10.     Owner acknowledges that a maritime lien is hereby created by his vessel and acknowledges that the vessel can be proceeded against and sold at a U.S. Marshall's sale to satisfy said lien and Owner and the vessel further agree to pay a reasonable attorney's fee to Agra in such event.

Agra/Owner
 Agreement
Page 2 of 2
_____/

11.     Additionally, the Owner or person authorized by the Owner recognizes that the services rendered to the vessel constitute necessaries for which a maritime lien exists under Title 46, USC §31342 and constitutes a maritime lien on the vessel which subjects the vessel to arrest by the U.S. Marshall, in the event of non payment, and filing of an "in rem" action against the vessel, as well as the ultimate sale of the vessel in the event services and necessaries rendered by Agra are not paid in full at the time of completion.

12.     I HEREBY AGREE TO SUBMIT MY VESSEL TO THE PROVISIONS OF FEDERAL RULE C OF THE MARITIME LAW ALLOWING FOR ARREST IN REM UPON DEFAULT.

13.     All materials must be purchased from Agra.

REGISTERED OWNER OF VESSEL
Name & Address:

_____

_____

_____

08/1/02          Signature :  By: _____
Date                                    OWNER OR MANAGING AGENT


VESSEL INFORMATION :  VESSEL/NAME : _____

MANUFACTURER : _____   YEAR  : _____

OFFICIAL NO. : _____   LOA   : _____

REGISTRY NO. : _____   DRAFT : _____

ENGINES      : _____

# AGRA YACHT SERVICE
## "YOUR FULL SERVICE BOAT YARD"
### 2617 NW 16TH STREET RD.
### MIAMI, FL 33125
### 305-635-6945

LABOR:                              $45.00 PER HOUR  (HELPER $30.00)
HAULING : FOUR (4) STRAPS ALL TIME  $ 3.50 PER FOOT LENGTH OVERALL (PULPIT TO PLATFORM)
LAUNCHING:                          $ 3.50 PER FOOT LENGTH OVERALL (PULPIT TO PLATFORM)
BLOCKING FEE                        $45.00

**LAY DAYS DRY**
$  .50 PER FOOT LENGTH OVERALL (DAY 1 TO 7)
$  .75 PER FOOT LENGTH OVERALL (DAY 8 TO 28)
$ 1.00 PER FOOT LENGTH OVERALL (DAY 29 TO 56)
$ 1.50 PER FOOT LENGTH OVERALL (DAY 57 TO 84)
$ 2.00 PER FOOT LENGTH OVERALL (AFTER 84 DAYS)

**LAY DAYS WET**
$  .50 PER FOOD LENGTH OVERAL (DAY 1 TO 30)
$  .75 PER FOOD LENGTH OVERAL (DAY 30 TO 60)
$ 1.00 PER FOOD LENGTH OVERAL (DAY 61 AND OVER)

**LAY DAY POLICIES:**
1. HAULING LAY DAY STARTS AT 8 O'CLOCK AM.
2. YARD MUST HAVE 1-DAY NOTICE PRIOR TO LAUNCHING.
3. LAUNCHING LAY DAY STOPS AT 5 O'CLOCK PM

**BOTTOM PAINTING**
TRINIDAD 75 , $17.00 PER FT ONE COAT
MICRON CSC $ 22.50 PER FT ONE COAT
RUNNING GEAR, STRIP, PRIMER AND PAINT $12.50 FT
SECOND COAT BOTTOM PAINT $250.00 + PAINT GL

PRESSURE CLEAN BOTTOM: .................. $   1.50 PER FOOT LENGTH OVERALL
TRAVEL LIFT SERVICE: ........................... $105.00 PER HOUR - 1 MAN AND MACHINE
FORK LIFT SERVICE:.............................. $ 75.00 PER HOUR - 1 MAN AND MACHINE
SCAFFOLDING (2 FRAMES, 1 BOARD): ... $   5.00 PER DAY PER FRACTION THEREOF
COMPRESSED AIR USE:........................ $   5.00 PER HOUR OR FRACTION THEREOF
AIR CONDITIONED VESSEL:.................... $   4.00 PER DAY PER UNIT USED
UTILITIES: 110 VOLT: ........................... $   2.50 PER DAY EACH LINE
            220 VOLT: ........................... $   5.00 PER DAY EACH LINE
WATER:........................................... $ 10.00 PER HOUR

ENVIRONMENTAL FEE (INCLUDES DISPOSAL AND CLEANING OF POLLUTANT MATERIALS): $150.00 PER INVOICE
LIABILITY INSURANCE FEE:   2.4% OF TOTAL INVOICE

OUT LABOR    ALL PERSONS OTHER THAN THE OWNER OR THE IMMEDIATE FAMILY ARE CHARGED $15.00 PER
POLICY       DAY OR FRACTION THEREOF. OUTSIDE CONTRACTORS AND FREELANCERS MUST CHECK IN TO
             THE YARD OFFICE BEFORE ANY WORK IS STARTED, AND MUST PROVIDE A CURRENT INSURANCE
             CERTIFICATE. ALL OUTSIDE CONTRACTORS MUST SIGN AGRA YACHT SERVICE'S HOLD
             HARMLESS WAIVER.

ANY SPRAYING OF ANY MATERIAL MUST BE DONE BY AGRA YACHT SERVICE OR OUR APPROVED SUB-CONTRACTOR.
BOTTOM PAINT AND MATERIALS MUST BE PURCHASED FROM OUR SHIP STORE AT A DISCOUNTED
PRICE OF 30% OFF LIST. A $50 PENALTY WILL BE CHARGED FOR SUPPLIES BROUGHT IN FROM
OUTSIDE THE BOAT YARD.
NO PARKING IN THE BOAT YARD! LOADING AND UNLOADING IS LIMITED TO 15 MINUTES. OVER 15 MINUTES
WILL RESULT IN A $10.00 FINE.
HURRICANE WARNING- AN ADDITIONAL $500.00 WILL BE CHARGED IN THE EVENT OF A HURRICANE WARNING
FOR VESSELS CURRENTLY ON PREMISES.
RESERVATIONS FOR HURRICANE SHELTER:
$ 1,250 PER SEASON.(COVERS ANY OCURRENCES, NOT INCLUDE HAULING,LAUNCHING, BLOKING AND LAY DAYS)
$  850.00 PER OCCURRENCE ANY LENGTH (PLUS HAULING, LAUNCHING AND BLOCKING)
NOTE: HURRICANE SERVICE FEES COVER ONLY A 3-DAY PERIOD, OR UNTIL HURRICANE WARNING IS LIFTED,
WHICHEVER COMES FIRST, OTHERWISE STANDARD LAUNCHING AND LAY DAY FEES WILL APPLY.
(ALL HURRICANE SERVICE MUST BE PAID IN FULL BEFORE HAUL.)

RULES AND REGULATIONS ARE POSTED NEXT TO YARD OFFICE DOOR.
ALL PRICES ARE EFFECTIVE AS OF AUG. 01, 2001 AND ARE SUBJECT TO CHANGE WITHOUT
NOTICE.
NO VESSELS WILL BE LAUNCHED OR LEAVE PREMISES IF BILL IS NOT PAID IN FULL. NO EXCEPTIONS!

SIGNED_____     DATE____08 / 1 / 02____

PLEASE PRINT NAME:_____